[Cite as *In re S.K.*, 2019-Ohio-2278.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY


IN RE: :

: CASE NOS. CA2018-11-025
S.K., et al. CA2018-11-026

:

O P I N I O N
: 6/10/2019

:


APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. AND20160488 thru AND20160494, 17AND0289, and 18AND0271


Jess C. Weade, Fayette County Prosecuting Attorney, Sean M. Abbott, 110 E. Court Street, 1st Floor, Washington C.H., Ohio 43160, for appellee, Fayette County Children Services

Kathryn Hapner, 127 N. High Street, Hillsboro, Ohio 45133, for appellant, Mother 1

Steven H. Eckstein, 1208 Bramble Ave., Washington C.H., Ohio 43160, for appellant, Mother 2


**HENDRICKSON, P.J.**

{¶ 1} Appellants, the mother of S.K., Ch.K., K.K., Jo.K., Ca.K., and B.B. ("Mother 1") and the mother of Ja.K., R.K., and L.K. ("Mother 2"), appeal the decision of the Fayette County Court of Common Pleas, Juvenile Division, granting permanent custody of their nine respective children to appellee, Fayette County Children Services ("FCCS"). For the

reasons outlined below, we affirm the juvenile court's decision.

### The Parties

{¶ 2}   There are nine children at issue in this case.  Mother 1 is the mother of S.K., born May 1, 2006, Ch.K, born October 12, 2007, K.K., born December 25, 2009, Jo.K., born October 3, 2011, Ca.K., born August 27, 2013, and B.B., born May 15, 2016.  Mother 2 is the mother of Ja.K., born June 24, 2016, R.K., born May 20, 2017, and L.K., born May 8, 2018.  With the exception of B.B., the other eight children were all fathered by the same man ("Father").  Neither Father nor B.B.'s father is a party to this appeal.

{¶ 3}   The record indicates Mother 1 and Father are married.  Father, however, is now in a relationship with Mother 2.  Although now separated, the record also indicates Mother 1, Mother 2, and Father had all lived together with the children in the same home.  And, after being evicted from that home, Mother 1, Mother 2, and Father all moved into a homeless shelter with the children.  Mother 1 now lives with her boyfriend in a four-bedroom duplex, whereas Mother 2, who has been diagnosed with depression and anxiety, and Father, who has been diagnosed as bipolar, live with a disabled couple in a one-bedroom apartment.

### FCCS's Complaints and the Juvenile Court's Adjudications and Dispositions

{¶ 4}   On August 30, 2016, FCCS filed six complaints alleging Mother 1's six children, S.K., Ch.K., K.K., Jo.K., Ca.K., and B.B., were neglected and dependent children.  FCCS also filed a complaint alleging Mother 2's then only child, Ja.K., was a neglected and dependent child.  In support, FCCS alleged it had received reports that the children were seen "unsupervised around town and begging for food."  Upon contacting Mother 1, Mother 2, and Father, FCCS alleged Mother 1 and Mother 2 claimed their respective children were with a "friend."  Mother 1 and Mother 2, however, only knew "the person's first name with

no idea of her last name or even the street where she lived."

{¶ 5} FCCS also alleged that Mother 1, Mother 2, and Father had recently been evicted from Mother 1's home where they lived with their then seven respective children. As noted above, upon being evicted, FCCS alleged the entire family moved into a homeless shelter. However, "the shelter stated they did not supervise or discipline any of the children and the shelter removed the family * * * for not following the rules." Upon being removed from the homeless shelter, FCCS alleged "the family has moved from house to house" and that the children went back out on the streets begging for food.

{¶ 6} FCCS alleged Mother 2 had since left Ja.K. with his grandfather. The child's grandfather, however, did not have any of the necessary supplies to take care of Ja.K. FCCS also alleged that Ja.K.'s grandfather could not properly care for the child due to a recent car accident. Due to the child's appearance, FCCS further alleged that it was concerned about Ja.K.'s health and well-being in that he appeared "to be failure to thrive." These concerns were further exacerbated by the fact Mother 2 only had one bottle to feed Ja.K, "which was not clean." FCCS also alleged that while feeding Ja.K., Mother 2 "had to remove objects from the bottle, and [Ja.K.] did not continue to drink the bottle."

{¶ 7} FCCS alleged that it had also received reports of domestic violence between Mother 1, Mother 2, and Father. FCCS further alleged the children "have received no medical attention and have not been enrolled in school." This includes Ja.K. who FCCS alleged Mother 2 had not taken to see a doctor since his birth. Concluding, FCCS alleged that Father was reportedly suffering from mental health issues, whereas Mother 2 "admits she suffers from post-partum depression." Due to these concerns, FCCS alleged there was "a present and ongoing threat of harm" to the children.

{¶ 8} Upon receiving FCCS's complaints, the juvenile court granted FCCS's request

for emergency temporary custody of all seven children. Three of the children were then placed with relatives, whereas the other four children were placed in foster care. Following a hearing on the matter, the juvenile court issued an entry detailing the facts and circumstances that led to the children's removal. As noted by the juvenile court, this included concerns from FCCS regarding the parties' subpar living conditions, homelessness, and the "lack of supervision of the children." The juvenile court also noted that the five oldest children all had headlice upon their removal and that "[t]he four oldest children are school age but had not been enrolled in school, despite the fact that the school year had already commenced." The juvenile court further noted that Mother 1 and Mother 2 had both reported that Father had anger issues.

{¶ 9} On September 28, 2016, a guardian ad litem was appointed for the children. Approximately one month later, the juvenile court adjudicated all seven children as dependent. A case plan was then established. The case plan required each parent to obtain and maintain stable housing, employment, and verifiable income, as well as complete parenting classes and any necessary mental health treatment. The juvenile court thereafter issued a dispositional decision that awarded temporary custody of the children to FCCS. The juvenile court's corresponding entry noted that "[t]he parents have not made much progress on their case plans." The juvenile court also noted that many of the children exhibited behavioral issues upon their removal from their respective parents' care. This includes two of the children killing a rabbit, as well as numerous instances of lying and stealing.

{¶ 10} On May 16, 2017, the juvenile court held a review hearing. Following this hearing, the juvenile court issued an entry noting that five of the children were now placed in foster care, whereas two of the children were placed with relatives. The juvenile court

also noted that the children's respective parents had completed parenting classes and that both Father and B.B.'s father were employed. Mother 1, however, "was working but lost her job last month." The juvenile court further noted that Mother 2, who was not working at that time, was then pregnant with what would become Father's seventh child, R.K.

{¶ 11} In addition to these findings, the juvenile court noted that Mother 1, Mother 2, and Father had not yet completed their required mental health assessments and that Mother 2 and Father had missed their last two scheduled visits with the children. The juvenile court also noted in regard to the possibility of the children being returned to their respective parents:

> The agency does not believe that the children can be returned home at this time. [Father] has not addressed his mental health issues. [Mother 2] has not shown that she can provide for herself. She is the victim of domestic violence from [Father]. [Mother 1] and [B.B.'s father] each have housing issues.

{¶ 12} On May 20, 2017, Mother 2 gave birth to R.K. Later that day, FCCS filed a complaint alleging R.K. was a dependent child. In support, FCCS noted that R.K.'s older brother, Ja.K., was then in its temporary custody and had been for nearly a year. FCCS also alleged that both Mother 2 and Father had still not completed their required mental health assessments. FCCS alleged the same was true in regard to Father's domestic violence classes. FCCS further alleged that Mother 2 and Father "had no food or belongings in their home with which to properly care for a newborn baby" and that they were then "sleeping in the same hospital bed with [R.K.] in the bed."

{¶ 13} On May 23, 2017, the juvenile court granted emergency temporary custody of R.K. to FCCS. Approximately two weeks later, the juvenile court issued a judgment entry that addressed its prior emergency order regarding R.K. As part of this entry, the juvenile court noted that Mother 2 and Father had completed their parenting classes and had

obtained housing. The entry also noted that Father had obtained employment through a temporary agency. But, as noted by the juvenile court, Father "ha[d] not been employed there long enough to demonstrate financial stability." The juvenile court further noted in regard to Father's mental health:

> The case plan required [Father] to get a mental health assessment and follow up on any recommendations. He has self-reported being diagnosed with schizophrenia and multi-personality disorder. The two mothers of his children, and other relatives have reported [Father] to be the perpetrator of physical and verbal domestic violence. [Father] has given conflicting accounts of how long he has gone without taking his mental health medication. He reported that he was only off his medication for two weeks, that he sees a doctor * * * and that he gets his medication at emergency rooms. Mental health reports [note] that [Father] has been off his medication since 2015. He has not submitted any documentation that he has had a mental health assessment or undergone any counseling.

{¶ 14} On July 6, 2017, the juvenile court adjudicated R.K. a dependent child. Approximately five weeks later, the juvenile court issued a dispositional decision that awarded temporary custody of R.K. to FCCS. The juvenile court also appointed R.K. with a guardian ad litem. Several months later, following another review hearing, the juvenile court issued an entry that noted the parties had stipulated that temporary custody of all eight of their children should remain with FCCS "to allow the parents to have more time to work their case plans."

{¶ 15} The guardian ad litem submitted a report with the juvenile court that same day. As part of that report, the guardian ad litem noted in regard to Mother 1:

> One of the mothers, [Mother 1], now has a home with her boyfriend. They live in a duplex. They want to move the boyfriend's mother out of the nursing home and into the other side of the duplex. [Mother 1] wants to be the caregiver for the boyfriend's mother who is morbidly obese and missing one leg. The boyfriend's mother also has her own seven page history with the agency. [Mother 1] is working at Bob Evans and making approximately $100 per week. When [Mother 1] visits the

children, she is responsible for bringing them dinner. She usually does not provide enough food for all the children, i.e. one bag of pizza rolls for [her six] kids.

{¶ 16} The guardian ad litem also noted in regard to Mother 2 and Father:

[Father and Mother 2] are still together. They had joined the traveling fair and moved to Tennessee. They would travel from Tennessee once a week to attend their visit. They have returned to Ohio and live in a one-bedroom home with two other people [Father] refers to as "Aunt and Uncle." The Aunt has a toilet chair in the middle of the living room and uses a walker. The Aunt told the worker that the children can reside there with them and they would sleep in their bedroom in between the hospital bed. [Father and Mother 2] work at Kroger stocking shelves. They work approximately 10 hours per week. They have told the worker that they have been approved to purchase a nine-bedroom home.

{¶ 17} Although informing FCCS that they were approved to purchase a nine-bedroom home, the record indicates Father later notified FCCS that he and Mother 2 never purchased the home because it was sold to someone else.[1]

**FCCS's Motions for Permanent Custody and Permanent Custody Hearing**

{¶ 18} On March 20, 2018, FCCS moved for permanent custody of the parties' then eight children; S.K., Ch.K., K.K., J.K., J.K., Jr., Ca.K., B.B., Ja.K., and R.K. In support, FCCS alleged the oldest seven children had been in its temporary custody for 12 months of a consecutive 22-month period. FCCS also alleged that all eight of the children could not be placed with any of their respective parents within a reasonable time or should not be placed with any of their parents. FCCS further alleged that granting it permanent custody of the children was in the children's best interest. Shortly after moving for permanent custody, Mother 2 gave birth to Father's eighth child, L.K. Considering it had already moved for permanent custody of L.K.'s eight other siblings, FCCS also requested permanent

---

1. We note that the record contains additional evidence indicating there are no nine-bedroom homes in Fayette County or the surrounding areas.

custody of L.K.

{¶ 19} On August 3, 2018, the juvenile court held a hearing on FCCS's nine requests for permanent custody. During this hearing, the juvenile court heard testimony from an ongoing caseworker assigned to the children's nine cases, the children's foster parents, as well as Mother 1, Mother 2, and Father. As part of this hearing, the caseworker testified that she was concerned with Mother 1 reunifying with her six children. Specifically, as the caseworker testified she was concerned with Mother 1's "ability to continue to maintain having all six children in the home," as well as "her counseling, her employment, keeping up with the rent and her house." And, as it relates to Mother 2, the caseworker testified she was concerned with Mother 2's employment, housing, and lack of continued mental health treatment. This included the caseworker testifying that Mother 2 had not "stayed at any employment more than two or three months. It's all been very part time at best."

{¶ 20} Following this hearing, the juvenile court issued a decision granting FCCS permanent custody of all nine children. In support, the juvenile court found that seven of the children had been in the temporary custody of FCCS for at least 12 months of a consecutive 22-month period. The juvenile court also found that all nine children needed a legally secure permanent placement that they could achieve only through a grant of permanent custody to FCCS. The juvenile court further found the children could not be placed with any of their respective parents within a reasonable time and should not be placed with any of their parents. Therefore, because the children had all improved since their removal from their respective parents' care, the juvenile court found it proper to grant FCCS permanent custody of the children.

### Juvenile Court's Best Interest Findings

{¶ 21} When considering the testimony and evidence presented, the juvenile court

found it was in the children's best interests to grant FCCS's motions for permanent custody. In reaching this decision, the juvenile court initially found Mother 1, Mother 2, and Father had regularly visited with their respective children. The juvenile court also found Mother 1 and Father were bonded to their children. But, as for Mother 2, the juvenile court found she "appears to spend a disparate amount of time with her youngest child [L.K.], but is interacting with all of her children." The juvenile court further found that all nine children were "getting along well" in their respective foster placements.

{¶ 22} Next, regarding the children's wishes, the juvenile court found most of the children were too young to express their wishes. The juvenile court, however, noted K.K. had expressed her desire to stay with her foster parents. The juvenile court also noted the guardian ad litem's report that recommended the juvenile court grant permanent custody to FCCS. The guardian ad litem reached this decision upon noting the following in regard to Mother 1:

> One of the mothers, [Mother 1], has a home with her boyfriend
> * * *. She started a relationship with the man after the removal
> of the children. The children do not know [the boyfriend]. [The
> boyfriend] has two children of his own that are currently being
> raised by a grandmother. They live in a duplex. They were
> renting both sides of the duplex and were remodeling it to make
> one large home. However, they have been evicted from one
> side of the duplex and have to put the walls back up. The side
> of the duplex they live in is only 2 bedrooms. According to the
> caseworker, there is no heat source in the home.

{¶ 23} The guardian ad litem also noted in regard to Mother 1's employment, income, and ability to care for her six children:

> [Mother 1] continues to work at Bob Evans and making
> approximately $100 per week. When [Mother 1] visits the
> children, she is responsible for bringing them dinner. She
> usually does not provide enough food for all the children, i.e.,
> one bag of pizza rolls for [six] kids, one casserole dish. [Mother
> 1] does not have transportation. When speaking with the
> caseworker she did not have a plan on how she would transport

six kids to the doctor or daycare. She did not have a plan as to who would watch [the] kids while she worked.

{¶ 24} The guardian ad litem further noted in regard to Mother 2 and Father:

[Father and Mother 2] are still together. They still reside with a disabled couple in a one bedroom home. At the last hearing [Father] told the worker they were approved to purchase a nine bedroom home. That has not occurred. [Father and Mother 2] do not have steady stable income. [Father] reports working at the fair last week. They have had several short-term jobs during the pendency of this case. They did have appropriate housing at one point in the case (about 1 1/2 years ago) but were evicted within 90 days.

{¶ 25} The guardian ad litem also noted specifically in regard to Father that he "admitted to following the caseworker home and knowing where she lives. She had to tell [Father] to leave her and her family alone." The guardian ad litem further noted an incident where Father became upset while visiting the children "and said that he would support his kids until the day he dies and said that he wasn't scared of anybody and he would go outside (to foster dad) and fight him if he had to." Therefore, when considering the best interests of the children, the guardian ad litem concluded that "[n]one of the parents are in any position to have all of the children placed with them."

{¶ 26} As it relates to the children's custodial history, the juvenile court found the oldest seven children had been in the temporary custody of FCCS for at least 12 months of a consecutive 22-month period beginning on August 30, 2016. But, as it relates to R.K., the juvenile court found that child had been in the temporary custody of FCCS since May 23, 2017, three days after the child's birth. And, as it relates to L.K., the juvenile court found that child had been in the temporary custody of FCCS since May 9, 2018, the day after the child's birth.

{¶ 27} Next, when considering the children's need for a legally secure permanent placement, the juvenile court found all nine children could only achieve such a placement

through a grant of permanent custody to FCCS. Although not specific, the juvenile court reached this decision based on a number of factors. For instance, the juvenile court found Mother 1 and Father had previously been subject to two safety plans prior to the removal of their six children. These safety plans were deemed necessary after "some of their children were selling water to people passing on State Route 38." When this incident was investigated, the juvenile court noted that the family home was found to be in a "deplorable state" and that the children had headlice. Mother 1 was ultimately convicted of misdemeanor child endangerment resulting from this investigation.

{¶ 28} The juvenile court found these conditions did not improve during a subsequent investigation into Mother 1's living conditions. Specifically, as the juvenile court found, the family home was still "deplorable" with "no food in the home" and the children had again contracted headlice. The juvenile court also noted that Mother 1 had then entered into another case plan due to the "conditions of the home, lack of food, and lack of supervision of the children." As part of this case plan, an aide was sent to Mother 1's home to assist her with the children. But, as the juvenile court found, "[i]f the aide was not present on any given day, the following day the home would be in a bad state again."

{¶ 29} Mother 1 and Father eventually ended their relationship. The record indicates that Father then moved into Mother 1's home with Mother 2. Mother 1, however, was shortly thereafter evicted from the home with Mother 2, Father, and the children. This is just one of several other evictions involving Mother 1. Although somewhat unclear, the record indicates that upon Mother 1 being evicted that Mother 1, Mother 2, and Father all moved into a homeless shelter with the children. But, due to the children's bad behavior, the family was asked to leave within two days of their arrival. Upon the parties' removal from the homeless shelter, the juvenile court noted the children were again found on their own "when

more than one person called Children Services about small children coming in to businesses * * * and begging for food."

{¶ 30} Continuing, he juvenile court found:

> When [Mother 1] was eventually located and confronted about the location of the children, she could only give a first name of who the children were supposed to be with. [Mother 1, Mother 2, and Father] and the children had been staying with various people. The two young babies, B.B. and Ja.K., were not being fed properly. The older children had headlice. Their hair had been "buzzed." The four oldest children were school age, but had not been enrolled, even though the school year had commenced.

{¶ 31} Next, the juvenile court found that while Mother 1 had obtained a mental health assessment, Mother 1's counselor had "not heard from, nor seen [Mother 1]" for many months. But, on a positive note, the juvenile court noted that Mother 1 had completed parenting classes and obtained housing. However, as it relates to that housing, the juvenile court noted that Mother 1 lives in a duplex with her boyfriend and his disabled mother. The juvenile court also noted that – despite both of them working full-time – Mother 1 and her boyfriend were oftentimes late on their rent payments. This, according to the case worker's testimony, was a "huge concern" since there were "just two people there, versus adding six children[.]" This was in addition to the caseworker's "concerns about the home's heating source being one, recently connected, gas fireplace and portable heaters."

{¶ 32} The juvenile court made additional findings in regard to Mother 2 and Father. As the juvenile court found:

> Both [Father and Mother 2] have a work history of changing jobs on a frequent basis. Most of their jobs have been part-time. They usually work at the same place at the same time, and leave the employment at the same time. Most recently they worked at Little Caesar's Pizza. They stated they have new jobs lined up at Candleite. Previously, [Father] was at Chappel Door for one week. He works at Yusa and WCR. They both worked at McDonald's, Kroger, and worked at a travelling carnival.

None of these jobs lasted more than a few months, some as brief as a few days.

{¶ 33} Concluding, due to their unstable employment and income, the juvenile court found neither Mother 2 nor Father had exhibited an ability to meet the basic needs of their children. This, as the juvenile court found, was further aggravated by the fact that Mother 2 and Father were then living with a disabled couple in a one-bedroom apartment "where there is not enough room for the children to reside there." The record indicates the apartment smelled like animal urine and that Mother 2 and Father were sleeping in the apartment's living room, but were thinking of converting the closet into a bedroom. And, similar to Mother 1, the juvenile court found both Mother 2 and Father were in arrears on their child support obligations.

{¶ 34} The juvenile court made further findings regarding all nine children. Specifically, the juvenile court found S.K. was very smart, but that she was trying to sabotage herself by completing her homework only to then throw it away and not turn it in at school. The juvenile court also found S.K. "could never relinquish the caretaker role she had assumed when the family was together." As it relates to Ch.K., however, the juvenile court found he was well-behaved, but that he was receiving counseling "as he is very emotional." The juvenile court also found Ch.K. liked school. The juvenile court further found that Ch.K. was placed with the same foster family as Jo.K., who the juvenile court noted was "doing well" in his foster home. The juvenile court also found Jo.K.'s behavior had improved since being placed in foster care.

{¶ 35} As it relates to K.K., the juvenile court found K.K. was the most improved of all nine children. The juvenile court based this decision upon finding K.K. had advanced from being "a very low performer" in kindergarten to being "advanced" now that she was in first grade. The juvenile court also found K.K. had "many rotten teeth" when she was

removed from Mother 1's care, but that she had since gone to the dentist and received caps on several of her teeth. The juvenile court further found that K.K. was in a relative placement with B.B., who the juvenile court found was a "happy toddler." The juvenile court also found B.B. was "doing well" and meeting his developmental milestones.

{¶ 36} In regard to the four remaining children, Ca.K. Ja.K., R.K., and L.K., the juvenile court found these children were all placed in the same foster home. The juvenile court found Ca.K. had a "very rough" start upon being placed in foster care. But, although he initially threw tantrums and had a hard time communicating, the juvenile court found Ca.K. was "doing better now." As for Ja.K., the juvenile court found he was "doing fairly well. He is not talking as well as a two-year old should, but he is developing in other things, such as walking on time." The juvenile court further found that the two youngest children, R.K. and L.K., were both meeting their developmental milestones.

**Appeal**

{¶ 37} Mother 1 and Mother 2 now appeal from the juvenile court's decision granting permanent custody of their nine respective children to FCCS, collectively raising four assignments of error for review. In support, Mother 1 and Mother 2 primarily argue the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. Mother 1 and Mother 2 also challenge the juvenile court's decision finding it was in the children's best interest to grant permanent custody to FCCS. Under these circumstances, this court applies the following standard of review.

Permanent Custody Standard of Review

{¶ 38} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been

met.  *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).  An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination.  *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.  This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented.  *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10.  However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence."  *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 39} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'"  *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases.  *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.  Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment,

most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

### Two-Part Permanent Custody Test

{¶ 40} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

### Best Interest Standard

{¶ 41} When considering the best interest of a child in a permanent custody case, the juvenile court is required to consider certain enumerated factors under R.C. 2151.414(D)(1). *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to, (1) the interaction and

- 16 -

interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24, citing *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

**Mother 1's Assignment of Error No. 1:**

{¶ 42} THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND THE COURT ABUSED ITS DISCRETION IN MAKING SUCH A GRANT OF PERMANENT CUSTODY.

{¶ 43} In her first assignment of error, Mother 1 argues the juvenile court erred by granting FCCS's motion for permanent custody of her six children, S.K., Ch.K., K.K., Jo.K., Ca.K., and B.B. Mother 1 supports her claim by arguing the juvenile court's decision finding it was in her children's best interest to grant FCCS permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

{¶ 44} When considering the juvenile court's best interest findings outlined above, we find no error in the juvenile court's decision to grant permanent custody to FCCS. Simply

- 17 -

stated, contrary to Mother 1's claims, the juvenile court's decision was neither "unfounded" nor unsupported by the record.[2] The record instead indicates that significant concerns remain regarding Mother's housing and her ability to provide financially for her six children. There were also concerns regarding Mother 1's mental health when considering Mother 1's counselor had "not heard from, nor seen [Mother 1]" for many months. In turn, while there was some indication that Mother had taken steps towards reunification, we find the record is nevertheless clear that there are substantial hurdles that Mother 1 still needs to address. Therefore, due to the uncertainty regarding Mother 1's housing, income, and untreated mental health issues, we find no error in the juvenile court's decision finding a grant of permanent custody to FCCS was the best chance for her six children to achieve the stable family home that they need. Mother 1's claims otherwise lack merit.

**{¶ 45}** We also find no merit to Mother 1's claim the juvenile court "mainly ignored" the positive aspects of her case and instead concentrated instead on the negative. After taking into consideration the evidence presented and the weight to be given to the witnesses' testimony, the juvenile court found it was in the children's best interest to grant permanent custody to FCCS. We agree. And, while we have no doubt that Mother 1 would like to be reunified with her children, "'[t]he law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm.'" (Internal brackets omitted.) *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53. This is because "[a] child's life is not an experiment that can be left to chance." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 40.

---

2. Mother 1 supports this claim, in part, by arguing the juvenile court "did not even mention the fact that [she] completed her parenting classes[.]" The record does not support this claim. The juvenile court in fact specifically stated within its decision that Mother 1 *did* complete her parenting classes.

{¶ 46} Mother 1's six children, just like all other children, are entitled to have stability in their lives by being placed in a legally secured permanent placement. *In re J.B.*, 12th Dist. Butler No. CA2018-08-175, 2018-Ohio-5049, ¶ 35. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. When considering FCCS's ongoing concerns regarding Mother 1's home, her capacity to provide financially for her children, and her mental health issues, the juvenile court's decision to grant FCCS permanent custody is the best chance for these children to obtain that stability and security within their lives. Therefore, contrary to Mother 1's claims, the juvenile court did not err by granting permanent custody of her six children to FCCS. Accordingly, finding no error in the juvenile court's decision, Mother 1's first assignment of error lacks merit and is overruled.

**Mother 1's Assignment of Error No. 2:**

{¶ 47} THE TRIAL COURT ERRED IN BY FINDING IT TO BE IN THE BEST INTEREST OF THE CHILDREN TO GRANT PERMANENT CUSTODY WITHOUT FINDING THAT APPELLANT IS UNFIT OR UNSUITABLE TO PARENT HER CHILDREN.

{¶ 48} In her second assignment of error, Mother 1 argues the juvenile court erred by granting permanent custody to FCCS without first finding she was an unfit or unsuitable option to parent her six children. We disagree.

{¶ 49} Each of Mother 1's six children had been in the temporary custody of FCCS for at least 12 months of a consecutive 22-month period at the time FCCS moved for permanent custody. Inherent within a 12-of-22 month finding rests the finding that she was unable, unfit, or unsuitable to care for her children. *In re A.J.P.-H.*, 11th Dist. Lake Nos.

2017-L-019 thru 2017-L-021, 2017-Ohio-5515, ¶ 42. "If the child has been placed in a children services agency's temporary custody for at least twelve months of the prior twenty-two months, some reason must exist why the child has not been in the parent's care. The reason normally would be because the parent has been unable to demonstrate that the parent is able, suitable, or fit to care for the child." *In re A.J.*, 11th Dist. Trumbull No. 2010-T-0041, 2010-Ohio-4553, ¶ 42, citing *In re Workman*, 4th Dist. Vinson No. 02CA574, 2003-Ohio-2220, ¶ 39. Therefore, because the juvenile court was not required to find Mother 1 was an unfit or unsuitable option to parent her six children prior to granting permanent custody to FCCS, Mother 1's second assignment of error also lacks merit and is overruled.

**Mother 2's Assignment of Error No. 1:**

{¶ 50} THE DECISION OF THE TRIAL COURT GRANTING PERMANENT CUSTODY TO FAYETTE COUNTY CHILDREN SERVICES IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**Mother 2's Assignment of Error No. 2:**

{¶ 51} THE DECISION OF THE TRIAL COURT GRANTING PERMANENT CUSTODY TO FAYETTE COUNTY CHILDREN SERVICES IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 52} In her two assignments of error, Mother 2 argues the juvenile court erred by granting FCCS's motions for permanent custody of her three children, Ja.K., R.K., and L.K. Similar to Mother 1 above, Mother 2 supports her claim by arguing the juvenile court's decision finding it was in her children's best interest to grant FCCS permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence. We again disagree.

{¶ 53} When considering the juvenile court's best interest findings outlined above,

- 20 -

we find no error in the juvenile court's decision to grant FCCS's motions for permanent custody of Mother 2's three children. Mother 2 nevertheless claims the juvenile court's decision was improper when considering she "had plans for the near future" that would be more than adequate to provide for her children. This includes getting a "better job and better housing." Mother 2 also argues the juvenile court's decision was improper since her "visitations were going well and she, likewise, would like to have permanent custody of her three children." Therefore, when considering her and Father's testimony, Mother 2 argues the juvenile court gave "undue credit to the testimony of the caseworker and the foster parent, especially the statement that the foster parents were going to adopt all three children." We find no merit to Mother 2's claim.

{¶ 54} Given the facts of this case, this court questions whether Mother 2 actually had planned to get a better job and better housing as she now claims. This is true despite Mother 2's testimony to the contrary. But, even when accepting Mother 2's testimony as true, Mother 2 never took the necessary steps to obtain either a better job or better housing so as to be reunified with her three children. Mother 2 had well over a year to turn her life around after her oldest child, Ja.K., was removed from her care. Yet, rather than focusing on what was needed to reunify with her children, Mother 2 instead jumped from job to job and house to house without demonstrating any ability to provide stability and security for her children. A parent "'is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal.'" *In re A.M.L.*, 12th Dist. Butler No. CA2013-01-010, 2013-Ohio-2277, ¶ 32, quoting *In re L.M.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 50.

{¶ 55} Mother 2, given a reasonable time to do so, failed to remedy the conditions that led to her children's removal from her care. When considering Mother 2 had not

- 21 -

completed most of her required case plan services, the blame for Mother 2 having now lost custody to all three of her children cannot be attributed to anything other than Mother 2's own conduct before, during, and after her children were removed from her care. Mother 2's claims that she is now ready to take steps towards reunification with her children is simply too little, too late. That is to say providing Mother 2 with any additional time at this juncture would do nothing more than prolong the inevitable. Therefore, contrary to Mother 2's claims, the juvenile court did not err by granting permanent custody of her three children to FCCS. Accordingly, finding no error in the juvenile court's decision, Mother 2's two assignments of error likewise lack merit and are overruled.

## Conclusion

{¶ 56} The juvenile court did not err in its decision granting FCCS permanent custody of Mother 1's and Mother 2's nine children, S.K., Ch.K., K.K., Jo.K., Ca.K., B.B., Ja.K., R.K., and L.K. The juvenile court, just like this court, must act in a manner that places the children's best interest above all else. The juvenile court's decision does just that. Simply stated, when considering the uncertainty surrounding both Mother 1's and Mother 2's housing, employment, income, and mental health, the juvenile court's decision to grant permanent custody of the children to FCCS was in the children's best interest. Therefore, because the juvenile court's decision granting FCCS's motions for permanent custody was proper, Mother 1's and Mother 2's four total assignments of error lack merit and are overruled.

{¶ 57} Judgment affirmed.

S. POWELL and RINGLAND, JJ., concur.