[Cite as *In re W.J.T.*, 2019-Ohio-3051.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NO. CA2019-03-047 |
| W.J.T. | : | O P I N I O N<br>7/29/2019 |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2016-0267

Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, Government Services Center, 315 High Street, 11th Floor, Hamilton, OH 45011, for appellee

Amy R. Ashcraft, P.O. Box 172, Seven Mile, Ohio 45062, for appellant

Carol Garner, 9435 Waterstone Blvd., Suite 140, Cincinnati, Ohio 45249, guardian ad litem

**M. POWELL, J.**

{¶ 1} Appellant, the mother of W.T. ("Mother"), appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of her son to appellee, Butler County Department of Job and Family Services ("BCDJFS" or "the agency"). For the reasons outlined below, we affirm the juvenile court's permanent custody determination.

{¶ 2} Mother is the biological mother of the child at issue, W.T., a boy, born December 8, 2003. W.T.'s biological father is not a party to this appeal.

## Complaint, Adjudication, and Disposition

{¶ 3} In August 2016, BCDJFS filed a complaint alleging that W.T., who was twelve years old at the time, was a dependent child as defined by R.C. 2151.04(C). Pursuant to that statute, a "dependent child" is any child "whose condition or environment is such as to warrant the state, in the interest of the child, in assuming the child's guardianship."

{¶ 4} The record reflects that Mother has not had custody of W.T. since 2005. Since then, W.T. has lived with various relatives and nonrelatives. At the time the complaint was filed, W.T. was in the legal custody of his maternal aunt, A.E., but was living with M.M., a family friend. The complaint indicated that in November 2015, A.E. reported she was no longer willing to care for W.T. and that W.T. then went to live with M.M. While living with M.M., W.T.'s psychologist reported that W.T. was homicidal and suicidal, and should not reside with M.M. Specifically, the psychologist was concerned that M.M.'s children, including a newborn and small child, could not defend themselves from W.T. As such, the psychologist suggested W.T. be removed from M.M.'s home and live in a home with either no children or older children.

{¶ 5} BCDJFS then moved the juvenile court for an emergency ex parte order based upon its allegation that W.T. was a dependent child. At that time, W.T. was incarcerated at a juvenile detention center, and the agency could not locate any family members to take care of the child upon his release. According to the record, neither A.E. nor any other relative expressed interest in receiving custody of W.T. After a hearing, the juvenile court granted temporary custody of W.T. to BCDJFS and granted Mother supervised visitation. A shelter care hearing was held the following day, and the juvenile court found that removing the child from M.M.'s home and granting temporary custody to

the agency was in W.T.'s best interest. As a result, BCDJFS placed W.T. in a group home where he was regularly receiving his medication and participating in counseling.

{¶ 6} In August 2016, a case plan was established that indicated Mother wanted to reunify with W.T. and that reunification was the permanency goal. The case plan required Mother to demonstrate her ability to safely care for W.T. and meet his basic needs, in addition to completing a domestic violence assessment, an in-home parenting program, a SAMI assessment, and any recommendations that followed. The case plan further required Mother to submit to random drug screens.

{¶ 7} In February 2017, following an adjudication hearing, the juvenile court issued an entry adjudicating W.T. a dependent child. Thereafter, the juvenile court held a dispositional hearing and issued an entry terminating the temporary custody held by BCDJFS, and placed W.T. back in the temporary custody of M.M., the family friend who had "physical custody" of W.T. at the time the complaint was filed. The juvenile court also adopted the August 2016 case plan, subject to a modification reflecting W.T.'s placement with M.M.

{¶ 8} In the months following, the record indicates Mother did not actively participate in the case plan services. Mother continued to abuse illegal drugs throughout the pendency of the case and failed to return a negative drug screen. The record also indicates Mother failed to consistently attend counseling, as required by the case plan, and that she was incarcerated on various occasions, for several months at a time, throughout the duration of the case. In addition, Mother failed to maintain a stable housing environment in order to complete the required in-home parenting program. While the record reflects that Mother maintained an apartment for six or eight months, she was ultimately forced to leave due to instances of domestic violence with her live-in boyfriend.

{¶ 9} The record further indicates that while W.T. was placed with M.M., Mother

began engaging in unsupervised contact with W.T., which was not permitted per the juvenile court's prior orders. The juvenile court indicated such contact could disrupt W.T.'s placement with M.M. and as a result, suspended Mother's visitation and contact with W.T. until Mother re-engaged in case plan services. The record reflects that Mother was unable to make adequate progress in the case plan services and was therefore prohibited from contacting W.T. for the remainder of the case.

{¶ 10} In November 2017, after a "violent incident" between M.M. and W.T., the juvenile court issued an order terminating M.M.'s temporary custody of W.T. and placed W.T. back in the temporary custody of the agency. According to the juvenile court, the change in custody was in W.T.'s best interest as he was back in juvenile detention for a charge of domestic violence related to M.M., had recently been suspended from school on multiple occasions, was admitted to the hospital due to drug use, refused to regularly take his medications, and would not follow M.M.'s rules.

{¶ 11} On August 15, 2018, BCDJFS moved for permanent custody of W.T. In support of its motion, the agency alleged that the child could not be placed with Mother within a reasonable time nor should he be placed with Mother. BCDJFS also alleged that no further treatment plan can be formulated for Mother and that it does not appear she could ever provide adequate parental care for W.T. Thereafter, on November 2, 2018, Mother filed a motion to grant M.M. sole legal custody of W.T.; however, Mother's motion was ultimately withdrawn because Mother failed to secure service on W.T.'s father.

**Permanent Custody Hearing**

{¶ 12} On November 16, 2018, a hearing regarding BCDJFS's motion for permanent custody was conducted before a juvenile court magistrate. At the hearing, the magistrate heard testimony from the BCDJFS caseworker assigned to W.T.'s case. The caseworker testified that although he had witnessed Mother and W.T. interacting well on two occasions,

he recommended permanent custody of W.T. to the agency. The caseworker indicated that Mother and W.T.'s positive interactions were outweighed by Mother's behavior throughout the case. The caseworker specifically discussed Mother's incarcerations between 2016 and 2017, her inconsistent attendance at counseling, and her inability to maintain stable housing due to ongoing domestic violence. The caseworker further indicated Mother tested positive for methamphetamine, marijuana, "benzos," and cocaine throughout the duration of the case. The caseworker also testified that although W.T. had expressed a desire to live with Mother, his primary focus was reunifying with M.M.

{¶ 13} In addition to the caseworker's testimony, the magistrate was also presented with the guardian ad litem's final report and recommendations. BCDJFS also submitted a November 2018 social summary, a substance abuse assessment conducted on Mother, an update on Mother's counseling services, a BCDJFS report on Mother, and a failed home study for M.M, which were admitted into evidence. Mother did not testify at the hearing, present any witnesses on her behalf, or object to any of the documents admitted into evidence.

**Juvenile Court's Decision**

{¶ 14} Following the hearing, the magistrate issued a decision granting BCDJFS's motion for permanent custody. In so holding, the magistrate determined that W.T. had been in the temporary custody of BCDJFS for 12 or more months of a consecutive 22-month period and that W.T.'s father had abandoned W.T. after not having any contact with the child for a period of at least 90 days. The magistrate also found that based on the evidence presented, BCDJFS had proved by clear and convincing evidence that a grant of permanent custody was in W.T.'s best interest.

{¶ 15} Mother filed objections to the magistrate's decision, arguing that the juvenile court did not allow enough time to serve her motion for legal custody to M.M., and that the

court's findings were not in the best interest of W.T., were not supported by the evidence, and were otherwise contrary to the manifest weight of the evidence. After a hearing, the juvenile court overruled Mother's objections and adopted the magistrate's decision in its entirety.

{¶ 16} Mother now appeals, raising two assignments of error. For the ease of review, we will address both assignments of error together.

**Appeal**

{¶ 17} Assignment of Error No. 1:

{¶ 18} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY GRANTING THE AGENCY'S MOTION FOR PERMANENT CUSTODY.

{¶ 19} Assignment of Error No. 2:

{¶ 20} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY GRANTING THE STATE'S MOTION FOR PERMANENT CUSTODY.

{¶ 21} In her two assignments of error, Mother argues the trial court erred in finding that granting permanent custody to the BCDJFS was in the best interest of W.T. Specifically, Mother contends there was insufficient evidence presented at the permanent custody hearing to establish by clear and convincing evidence that permanent custody was in the child's best interest. Mother further argues the trial court's finding was against the manifest weight of the evidence. We find no merit to Mother's claims.

Permanent Custody Standard of Review

{¶ 22} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, *citing Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile

court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. In turn, this court will reverse a juvenile court's decision only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 23} In determining whether a lower court's decision is against the manifest weight of the evidence, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

Two-Part Permanent Custody Test

{¶ 24} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C.

2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met for the second prong of the permanent custody test to be satisfied. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

Analysis

{¶ 25} As it relates to the second part of the two-part permanent custody test, the juvenile court found W.T. had been in the temporary custody of BCDJFS for more than 12 months of a consecutive 22-month period as of the date BCDJFS moved for permanent custody. Specifically, the juvenile court found W.T. had been in the temporary custody of BCDJFS for 14 months, as he was placed in the agency's temporary custody from August 4, 2016 to March 9, 2017, and then was replaced in the agency's temporary custody on November 7, 2017, where he has remained ever since. Mother does not dispute this finding, a finding which we note is supported by the record. Instead, Mother raises several issues regarding the juvenile court's finding that granting permanent custody of W.T. was in his best interest. Specifically, Mother disputes the juvenile court's best interest finding by arguing the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

{¶ 26} When considering the best interest of a child in a permanent custody hearing,

the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors, including, but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶ 27} Initially, with respect to W.T.'s relevant interactions and relationships with those who may significantly impact his life, the juvenile court discussed W.T.'s relationships with A.E., M.M., and Mother. It found that although Mother and W.T. interacted well on two occasions, Mother has had limited contact with W.T. during the case due to her instability, multiple incarcerations, and failure to follow through with case plan services. The juvenile court further found that while W.T. was in A.E.'s custody, Mother reportedly cared for him on a regular basis and that A.E. was investigated on multiple occasions for physical abuse and neglect during that time. A.E. has not maintained any contact with W.T. since the filing of the dependency complaint.

{¶ 28} With regard to W.T.'s relationship with M.M., the juvenile court found that BCDJFS attempted to place W.T. with M.M. on multiple occasions, however, each placement was unsuccessful. The juvenile court noted that despite the contrary interactions between W.T. and M.M. which led to W.T.'s removal, M.M. has continued to maintain contact with W.T. and he remains bonded with her.

{¶ 29} Next, regarding W.T.'s wishes, the juvenile court relied on the guardian ad litem's report and recommendation that permanent custody of W.T. should be granted to

BCDJFS. The guardian ad litem noted that W.T. wished to be placed in the legal custody of M.M.; however, she believed W.T.'s "behaviors are not conducive to exploring legal custody at this time."

{¶ 30} Moreover, with regard to W.T.'s custodial history, the juvenile court found that throughout the case, W.T. had been placed in the temporary custody of the agency twice, and was also placed in the temporary custody of M.M. In total, the juvenile court indicated W.T. had been in the temporary custody of BCDJFS for approximately 17 months and out of a family member's care for the entirety of his case, which lasted 27 months.

{¶ 31} Furthermore, when considering W.T.'s need for a legally secure placement, the juvenile court found W.T. was in need of a legally secure placement due to the time he had already spent in foster care and the fact Mother had made no progress towards remedying the conditions which caused W.T. to be removed. The juvenile court further indicated that W.T. has not actually been in a parent's custody since March 2005, when he was removed from Mother's care due to her substance abuse, mental health concerns, extensive criminal history, and instances of domestic violence. The juvenile court also referred to a previous unsuccessful placement with M.M., and noted "that [W.T.] was placed for several months in late 2006 with [M.M.] during that case as well, but was ultimately placed with [A.E.]"

{¶ 32} Continuing with this factor, the juvenile court found that the agency made numerous attempts to stabilize W.T.'s placement with M.M., but W.T.'s mental health needs were too significant. Specifically, the juvenile court indicated W.T. "continues to demonstrate violent behaviors despite ongoing mental health treatment, including psychiatric care." It went on to find that W.T. has had altercations with his peers of his group home, including an altercation that resulted in assault charges being filed against him. Without monitoring by the staff of his group home, W.T. struggles to take his

medications and indicated he would not take his medication or attend his mental health appointments when he "goes back to live with family."

{¶ 33} The juvenile court also found that Mother has been unsuccessful in "addressing the numerous issues which were also present when [W.T.] was originally removed from her custody[,]" including failing to consistently address her mental health and substance abuse issues. The juvenile court further noted that Mother continued to have numerous incarcerations throughout the pendency of this case, had repeated issues with domestic violence with her paramour, failed to maintain housing for longer than six months, and failed to attend domestic violence victim treatment on a regular basis. Based on the above and in light of W.T.'s mental health concerns, the juvenile court found that "there are significant concerns that if [W.T.] was placed back with his mother without Mother having successfully addressed her own substance abuse and mental health issues, W.T.'s mental health would suffer significantly as a result."

{¶ 34} The juvenile court then again expressed its concerns with placing W.T. with either M.M. or Mother, as W.T. desired. Specifically, the juvenile court found:

> [W.T.] has continued to have significant behavioral concerns and mental health concerns that have not been able to be resolved sufficiently to safely place him in a family setting, and although he clearly wants to be successful, he has not demonstrated the capacity to act appropriately thus far, despite mental health interventions. His history of contacts with the juvenile justice system and negative interactions in his various placements is concerning, and [W.T.] appears to be in need of structure and stability in any placement in order to be successful.

{¶ 35} Based upon the foregoing, the juvenile court concluded that the legally secure permanent placement that W.T. needs "cannot be obtained without a grant of permanent custody to the agency."

{¶ 36} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to

(11), the juvenile court reiterated its findings under R.C. 2151.414(E)(10) that W.T.'s father had abandoned him, as he had not visited W.T. throughout the pendency of the case, which was a period of more than 90 days.

{¶ 37} Considering the testimony and evidence presented we find the record fully supports the juvenile court's decision finding it was in W.T.'s best interest to grant permanent custody to BCDJFS. While Mother disputes this finding by arguing the juvenile court's decision was not supported by clear and convincing evidence and was against the manifest weight of the evidence, we find no merit to Mother's claims.

{¶ 38} Mother initially argues the juvenile court's decision to grant permanent custody was improper because there is no guarantee that W.T. will ever be placed in a family setting and could age out of the group home. However, while it is true there is no guarantee that W.T. will be placed in a family setting, the juvenile court was tasked to determine whether the grant of permanent custody to the agency is in the best interest of the child, not whether a family placement was guaranteed.

{¶ 39} Here, the record reflects that the juvenile court did an extensive examination of the best interest factors prior to granting BCDJFS's motion for permanent custody. It is evident, as the trial court found, that Mother cannot offer W.T. the stability and structure he needs in order to be successful. Specifically, the record indicates Mother has not had custody of W.T. since he was two years old and he has not had a consistent home or family placement since that time. It appears the most stable environment W.T. has had thus far in life was with M.M. However, while this court recognizes M.M.'s bond with and commitment to W.T., his numerous placements with M.M. have been unsuccessful despite her good intentions, and any future success appears unlikely as M.M. recently failed a home study due to her inability to meet W.T.'s needs. Additionally, M.M. did not testify at the permanent custody hearing, and Mother withdrew her motion to award legal custody to

M.M. before it was considered by the juvenile court. Thus, simply because there is a possibility that W.T. will not be placed in a family setting does not render the juvenile court's finding contrary to W.T.'s best interest. Rather, the record reflects W.T. does not have a stable family setting available with Mother or M.M., and therefore, absent a grant of permanent custody to the agency, W.T. has no opportunity to gain the stability and permanency he requires. Mother's claims to the contrary lack merit.

{¶ 40} Mother also argues the evidence shows she participated in most of the case plan services that she could, given the "time restraints of this case," and that the evidence does not support that she "failed continuously and repeatedly to remedy the conditions causing the removal." Mother supports this argument by stating she was participating in substance abuse treatment and "had been on and off since the onset of the case." Additionally, Mother blames W.T.'s caseworker for failing to complete her in-home parenting course.

{¶ 41} Despite Mother's claims, the record indicates Mother was given ample opportunity to prove she could adequately and safely provide for W.T. This case was pending for approximately two years before the agency filed its motion for permanent custody. During that time, Mother did not successfully complete most, if not all, of her case plan services. While this court acknowledges that Mother was incarcerated for a portion of that time, "a parent is afforded a reasonable, not an indefinite, period to remedy the conditions causing the child's removal." *In re G.W.*, 12th Dist. No. CA2019-01-003, 2019-Ohio-1586, ¶ 53. Furthermore, Mother was released from incarceration in December 2017, yet remained unable to consistently re-engage in case plan services prior to the permanent custody hearing in November 2018.

{¶ 42} Moreover, BCDJFS presented evidence at the permanent custody hearing which, if believed, established that Mother failed to complete her case plan services. This

includes her failure to participate in a substance abuse treatment program and a mental health treatment program, which were recommended after Mother completed a SAMI assessment and required by the case plan. While Mother argues she participated in treatment "on and off," the record indicates her services were ultimately terminated due to her lack of attendance. Mother was also recommended to attend a domestic violence victim group, but the record reflects she failed to engage those services. Additionally, according to the evidence presented at the hearing, Mother was incarcerated for extended periods of time throughout the duration of the case and was unable to return a negative drug screen from July 2016 through December 2018.

{¶ 43} We find Mother's shortcomings particularly concerning as W.T. was originally removed from Mother's care in 2005 due to Mother's mental health concerns, illegal substance abuse, and instances of domestic violence. Mother, having lost custody of W.T. to his aunt, A.E., clearly did not appreciate the severity of the agency's concerns in 2005, as it has identified similar concerns in this case. As such, the blame for Mother having now lost custody to W.T. permanently cannot be attributed to anything other than Mother's own conduct before, during, and after he was removed from her care.

{¶ 44} Similarly, we do not find merit in Mother's allegation that W.T.'s caseworker prevented Mother from engaging in the in-home parenting course ("DLS"). The record indicates Mother was put on a waiting list for DLS in June 2016. In August 2016, there was an opening for Mother, however, she did not have stable housing and was therefore precluded from participating in the program. At that time, Mother was advised she would be referred to DLS once she secured stable housing. It is not the fault of the caseworker that Mother did not have stable housing when there was an opening for DLS, or that Mother was unable to maintain stable housing prior to the agency filing for permanent custody of W.T. two years later. Moreover, there is no evidence in the record to suggest Mother had

stable housing, and the caseworker refused to refer her to DLS. Rather, as the juvenile court noted, the only housing Mother maintained throughout the case was a "household rife with domestic violence," which she resided at for six months in 2018.

{¶ 45} Additionally, it is well established that "the case plan is 'simply a means to a goal, but not the goal itself.'" *In re E.B.*, 12th Dist. Warren No. CA2009-10-139, 2010-Ohio-1122, ¶ 30, *quoting In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, ¶ 25, 932 N.E.2d 360 (8th Dist.). "[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. The case plan services, including participation in the DLS program, were implemented to enable Mother to demonstrate her ability to safely care for W.T. and meet his basic needs. Considering Mother failed multiple drug tests and was incarcerated on and off during the pendency of this case, was inconsistent in her counseling sessions, had not addressed her mental health concerns, and had yet to obtain suitable housing, it is clear that Mother never remedied, let alone substantially remedied, any of the concerns that caused W.T. to be removed from her care or demonstrated any ability to care for W.T. Therefore, contrary to Mother's claim, when the focus is on the child's best interests, sufficient credible evidence exists in the record to support the juvenile court's decision to grant permanent custody to BCDJFS was proper.

## Conclusion

{¶ 46} The juvenile court did not err in its decision to grant BCDJFS's motion for permanent custody. This is because, as discussed more fully above, the juvenile court's decision to grant permanent custody was supported by clear and convincing evidence and was otherwise not against the manifest weight of the evidence. The juvenile court, just like this court, must act in a manner that places W.T.'s best interest above all else. "'A child's

best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, *quoting In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision to grant BCDJFS's motion for permanent custody is in W.T.'s best interest as it gives him the best opportunity for the structure and stability he needs to grow and develop into a well-rounded adult. Therefore, finding no merit to any of the arguments raised herein by Mother, Mother's assignments of error are overruled and the juvenile court's permanent custody determination is affirmed.

{¶ 47} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.