[Cite as *In re M.G.*, 2021-Ohio-1000.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN RE: :

     M.G. : CASE NO . CA2020-10-070

: <u>O P I N I O N</u>
3/29/2021

:

:


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 18-D000003


Lauren L. Clouse, 5155 Financial Way, Suite 16, Mason, Ohio 45040, for appellant

David P. Fornshell, Warren County Prosecuting Attorney, Kathryn M. Horvath, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

Joshua Burns, P.O. Box 959, Lebanon, Ohio 45306, guardian ad litem


**S. POWELL, P.J.**

{¶ 1} Appellant, a mother ("Mother"), appeals the decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter, M.G., to appellee, Warren County Children Services ("WCCS"). For the reasons outlined below, we affirm the juvenile court's decision.

**Facts and Procedural History**

{¶ 2} Mother gave birth to M.G. on January 29, 2016. M.G.'s father is not a party to this appeal. Mother has given birth to a total of five children. Mother's three eldest children were removed from Mother's care after a children services case was opened in Kentucky in 2007. The record indicates that the three of these children who are still minors are in the legal custody of a family member. Mother's fourth child, B.S., was also removed from Mother's care. The record indicates that B.S. is now in the legal custody of her father.

{¶ 3} On January 19, 2018, WCCS filed a complaint alleging M.G. was a dependent child. WCCS filed this complaint after it received a referral indicating Mother had just been arrested for shoplifting from a local Kohl's department store and for having several outstanding warrants for her arrest. There is no dispute that M.G., as well as her older sister, B.S., were with Mother at the time of Mother's arrest.

{¶ 4} In its complaint, WCCS also alleged that the officer who arrested Mother had informed WCCS that he had been unable to locate anybody who could take care of M.G. After being so informed, WCCS alleged that it then took emergency custody of M.G. WCCS alleged that M.G. was then placed with a "non-relative for the night," but that this arrangement was "not a long term option."

{¶ 5} Continuing, WCCS alleged, in pertinent part, the following:

> WCCS has received referrals for the family in the past for concerns of Mother's drug use; however, those referrals were screened out because Mother and [the] children could not be located. Mother is currently on probation through the State of Kentucky until 2020. Mother reported that she lost custody of her three older children due to her past drug use. Mother reports that she has not used drugs for almost four years. She reports that she is engaged in treatment through the CAT House in Cincinnati, OH and she has been prescribed Suboxone for almost four years.[1]

---

1. The "CAT House" is more formally known as the Center for Addiction Treatment, which serves as a drug and alcohol addiction treatment and medical detox center.

{¶ 6} After WCCS filed its complaint, M.G. was appointed a guardian ad litem. M.G., who at that time was just ten days shy of her second birthday, was then placed with a licensed foster family. There is no dispute that M.G. has remained in that same foster placement with the same foster family ever since. There is also no dispute that M.G., who is now five years old, refers to her foster parents as her mother and her father.

{¶ 7} On March 23, 2018, the juvenile court adjudicated M.G. a dependent child. Shortly thereafter, on March 29, 2018, the juvenile court issued a dispositional decision awarding temporary custody of M.G to WCCS. As part of this decision, the juvenile court noted that WCCS had made reasonable efforts to prevent the continued removal of M.G. from Mother's care. The juvenile court also noted that WCCS had made reasonable efforts to make it possible for M.G. to return safely to Mother.

{¶ 8} A case plan was then established for Mother. The case plan required Mother to complete a drug and alcohol assessment, submit to random drug screens, undergo a mental health evaluation, and remain clean and sober. Mother was also required to refrain from engaging in criminal activity, as well as to maintain and provide a safe, stable, and suitable home environment for M.G. This included a requirement that prohibited Mother from associating with or allowing any known substance abusers from entering her home and/or associating with M.G. This was in addition to a requirement that Mother maintain suitable employment that would provide her with a steady source of verifiable income.

{¶ 9} On October 4, 2018, the juvenile court conducted a 180-day review hearing. Following this hearing, on October 9, 2018, the juvenile court issued a decision that found it was in M.G.'s best interest to keep its prior temporary custody order in place. Within that decision, the juvenile court also found Mother was taking Suboxone to address her opioid addiction and that Mother, who the juvenile court found has a "heart condition," had recently

tested positive for marijuana and Xanax. The juvenile court further found Mother has housing, but no transportation, and that "[s]he works under the table." As for M.G., the juvenile court found M.G. was residing in "foster care with 2 other foster children" and that M.G. had "adjusted well to placement" with her foster family.

{¶ 10} On December 28, 2018, WCCS moved the juvenile court for an extension of its temporary custody order. In support of its motion, WCCS stated, in pertinent part, the following:

> Mother's mental health has been an ongoing concern for WCCS. As a result, it was recommended for her to have a psychological evaluation. A referral was made on June 27, 2018. Mother has not completed a psychological evaluation at this time. Mother tested positive for marijuana in July 2018 and tested positive for Xanax is September 2018. Mother has not provided proof of a Xanax prescription. She also denies using marijuana. Mother has subsidized housing and reports being employed through a friend. While Mother is engaged in case plan services, more time is needed in order for her to successfully complete her case plan and demonstrate mental health stability and long-term sobriety. WCCS also would like for Mother to complete the psychological evaluation before increasing Mother's visitation.

{¶ 11} On March 13, 2019, the juvenile court issued an entry granting WCCS' motion for an extension of its temporary custody order.

{¶ 12} On April 4, 2019, the juvenile conducted a 360-day review hearing. Later that day, the juvenile court issued a decision that found Mother had engaged in some of the required case plan services, but that Mother was nevertheless "under the influence during her last call with the case worker." The juvenile court also found that Mother was asked to "leave when she was nodding off trying to get her food stamps." Mother, however, "refused to go to the agency and drug screen." The juvenile court further found that "[t]hree days later [Mother] sounded the same." The juvenile court additionally found that Mother had yet to complete her required parenting classes as set forth in her case plan.

{¶ 13} On June 12, 2019, WCCS moved the juvenile court for another extension of its temporary custody order. In support of its motion, WCCS noted that Mother had made progress in that she had completed her psychological evaluation and that Mother was engaged in the mental health treatment recommendations resulting therefrom. WCCS also noted that Mother's visitation time with M.G. had "gradually increased" based on the progress Mother had made on her case plan, but that Mother's visitation time had still "yet to progress to unsupervised time" with M.G. There is no dispute that M.G. had at this time been in the temporary custody of WCCS for over a continuous and consecutive 16-month period.

{¶ 14} Approximately seven months later, on January 13, 2020, WCCS moved the juvenile court to grant legal custody of M.G. to Mother. To support this motion, WCCS stated the following:

> [Mother] has actively engaged in case plan services and will continue with her ongoing mental health and drug and alcohol treatment. She has stable housing and has shown proof of income throughout the duration of the case. She has demonstrated sobriety and there are not ongoing concerns for drug abuse at this time. [M.G.] has begun an in-home trial placement in [Mother's] home and the transition is going well. Prior to the home-trial, [Mother] was visiting with [M.G.] for 8-hours unsupervised and was able to demonstrate her parenting skills. [Mother] has indicated a willingness to engage in a voluntary case with WCCS if this case were to close.

{¶ 15} On March 2, 2020, WCCS withdrew its motion requesting legal custody of M.G. be granted to Mother. WCCS instead moved for permanent custody of M.G. WCCS also requested Mother's visitation time with M.G. be suspended. WCCS filed this motion after learning that Mother had been arrested and charged with possession of drugs and child endangering on the night of February 29, 2020. There is no dispute that Mother's arrest occurred while Mother was exercising unsupervised, overnight visitation time with M.G.

{¶ 16} As stated in the guardian ad litem's report, the charges against Mother were based on the following:

> On [February 29, 2020], around 1:00 p.m., police were called [to a] Subway Restaurant in Franklin regarding Mother appearing to be intoxicated or under the influence of drugs inside while [M.G.] was with her. [Mother] walked from Subway to her residence, approximately, 3 miles, in frigid temperatures.
>
> At 2:50 p.m., [WCCS] was contacted by Mother's landlord. The landlord reported that Mother was outside of the apartment complex in the freezing weather with [M.G] for between 1 and 1 1/2 hours. [Mother] had attempted to enter what she thought was her own apartment where she has lived for years, but was actually her neighbor's apartment. [Mother] contacted the landlord insisting that the locks had been changed. The landlord was concerned because Mother had [M.G.] in the cold weather for so long. [The landlord] eventually led Mother to the correct apartment. WCCS called police for a well-check and Mother did not answer the door.

{¶ 17} Continuing, the guardian ad litem stated:

> At 10:40 p.m., Franklin Police were called by Speedway Gas Station employees (also in Franklin) regarding [Mother] who was inside their store. [Mother] had walked from her residence to the gas station (again about 3 miles) and had been inside for over an hour. The employees described [Mother] as "nodding off" while standing inside. When police arrived, [Mother] had slurred speech and could not focus on forming complete sentences. She had blue around her lips and said it was from a red Slushie. Officers found [Mother] holding 3 Xanax pills in her hand but [Mother] denied taking any Xanax that day, though to officers she appeared clearly under the influence of drugs. Mother was taken to Kettering-Franklin Hospital due to her intoxication and has been charged with drug abuse and child endangering. The foster parents picked [M.G.] up from Speedway.
>
> The officer concluded that, from his investigation, he believes that Mother spent most of this cold February day **"under the influence of drugs and made her child walk with her as she made her way across [Franklin] several times in a drug induced stupor."**

(Bold text sic.).

- 6 -

{¶ 18} Shortly after this incident, the record indicates M.G. began wetting her bed nightly and receiving weekly therapy sessions. The record also indicates that M.G. told her foster mother that she did not want to see Mother anymore.

{¶ 19} On July 20, 2020 and September 24, 2020, the juvenile court held a two-day hearing on WCCS' motion for permanent custody. At this hearing, the juvenile court heard testimony from Mother, several caseworkers with WCCS, and M.G.'s foster mother, among others. As part of this testimony, M.G.'s foster mother testified that M.G. has a "very close bond" with her and her husband. M.G.'s foster mother also testified that M.G. loved to spend time with her and her husband and "always says mommy can we go shopping or um, let's paint our nails or she just really likes being close, and, um, having that positive relationship. Um, she is um, loving, and sweet, and cuddling." M.G.'s foster mother further testified that M.G., without any prompting from either her or her husband, would call the foster parents "mom" and "dad." M.G.'s foster mother additionally testified she and her husband did not treat M.G. any differently than their two other children, including, for example, the giving of Christmas presents and taking family vacations.

{¶ 20} On September 28, 2020, the juvenile court issued a lengthy, detailed 16-page decision granting WCCS' motion for permanent custody. In so holding, the juvenile court noted that it had given "no weight whatsoever" to Mother's version of events leading up to her arrest on February 29, 2020 and "total weight" to the version testified to by the responding officer, Franklin Police Department Patrolman Riley Hensley. The juvenile court also noted that it had found it clear that "Mother was under the influence of Xanax that night and was incapable of taking care of herself, let alone a young child."[2] The juvenile court

---

2. We note that Patrolman Hensley's testimony regarding the events leading up to Mother's arrest on February 29, 2020 confirm the allegations set forth in the guardian ad litem's report and recommendation submitted to the juvenile court for review.

further noted that it had found Mother's actions on February 29, 2020 firmly established that Mother was "unable, incapable, and unwilling to live a life free from illegal substances." The juvenile court additionally noted that it had found "Mother's continued and repeated use of illegal drugs through the life of this case with her final act of being arrested on February 29, 2020 in front of [M.G.] is proof that she is not able to provide for [M.G.]."

**Appeal**

{¶ 21} Mother now appeals the juvenile court's decision granting WCCS' motion for permanent custody, raising the following single assignment of error for review.

{¶ 22} THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTEREST OF THE CHILDREN, PURSUANT TO THE FACTORS SET FORTH IN R.C. 2151.414(D), WAS REACHED BY GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

{¶ 23} Mother argues the juvenile court erred by finding it was in M.G.'s best interest to grant WCCS' motion for permanent custody. We disagree.

**Permanent Custody Standard**

{¶ 24} Before a mother's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). To that end, "[a]n appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 12th Dist. Butler No. CA2020-07-074, 2020-Ohio-6663, ¶ 13, citing *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6; and *In re A.S.*, 12th Dist. Butler Nos. CA2019-05-071, CA2019-05-072, and

CA2019-05-073, 2019-Ohio-4127, ¶ 19. "This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10.

{¶ 25} "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19. In determining whether a juvenile court's decision to grant a child service agency's motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶ 26} "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25, citing *Eastley* at ¶ 21. We are especially mindful of this in permanent custody cases. *See In re C.D.*, 12th Dist. Clermont No. CA2019-02-014, 2019-Ohio-4911, ¶ 13 ("[t]he presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases"). A

judgment will be reversed as being against the manifest weight of the evidence "only in the most extraordinary cases." *In re McLaughlin*, 5th Dist. Stark No. 2002-CA-00316, 2003-Ohio-761, ¶ 4. When this occurs, the juvenile court's decision will be reversed, and a new trial ordered. *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61, citing *In re D.P.*, 2020-Ohio-6663 at ¶ 14.

**Two-Part Permanent Custody Test**

{¶ 27} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. The juvenile court must first find the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. The juvenile court must then find any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10, citing R.C. 2151.414(B)(1)(a) to (e). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

**Mother's Argument is Limited to the Best Interest of M.G.**

{¶ 28} Mother does not challenge the juvenile court's decision finding M.G. had been

- 10 -

in the temporary of WCCS for at least 12 months of a consecutive 22-month period. Mother instead challenges the juvenile court's decision finding it was in M.G.'s best interest to grant WCCS' motion for permanent custody. Therefore, because Mother challenges only the juvenile court's decision finding it was in M.G.'s best interest to grant WCCS' motion, we will limit our discussion to Mother's arguments. We note, however, that M.G. had been in WCCS' temporary custody for a continuous and consecutive period of 25 months and 12 days at the time WCCS moved for permanent custody of M.G.

**Best Interest of the Child Standard**

{¶ 29} When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. Pursuant to R.C. 2151.414(D)(1)(a) thru (e), these factors include, but are not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24. No one factor is given greater weight than the others. *In re S.H.*, 12th Dist. Butler Nos. CA2020-02-023 and CA2020-02-024, 2020-Ohio-3499, ¶ 30, citing *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 49. Nor is any one factor dispositive. *In re Bailey*, 11th Dist.

Geauga No. 2001-G-2337, 2001 Ohio App. LEXIS 3294, *17 (July 20, 2001).

**The Juvenile Court's Best Interest Findings**

{¶ 30} Within its 16-page decision, the juvenile court made a number of findings as it relates to the best interest factors set forth above. For instance, with respect to M.G.'s relevant interactions and interrelationships with those who may significantly affect her life, the juvenile court found M.G. had bonded with her foster parents and is "doing great" in their care. The juvenile court also found M.G.'s only chance at stability was to be placed in the permanent custody of WCCS so that it could arrange for M.G. to be adopted.

{¶ 31} Next, in regard to M.G.'s wishes, the juvenile court did not state M.G.'s wishes, likely due to her young age. The juvenile court instead relied on the report and recommendation of the guardian ad litem, who recommended WCCS' motion for permanent custody be granted. The guardian ad litem made this recommendation after outlining Mother's prior substance abuse issues and criminal record. As noted above, this includes Mother's arrest on the evening of February 29, 2020, a time during which Mother was exercising unsupervised, overnight visitation with M.G.

{¶ 32} As it relates to M.G.'s custodial history, the juvenile court found M.G. had been in the temporary custody of WCCS since January 19, 2018. As noted above, this is well over 12 months of a consecutive 22-month period. Mother does not dispute this finding.

{¶ 33} Moreover, with respect to M.G.'s need for a legally secured permanent placement, the juvenile court determined that this could only be achieved with a grant of permanent custody to WCCS. In so finding, the juvenile court stated:

> Specifically, Mother is unable to demonstrate that she is capable of living her life free from using illegal drugs. Her use of drugs puts [M.G.'s] safety at risk. As recent as February 29, 2020, Mother, while given the opportunity to have unsupervised contact with [M.G.], had her out late at night when Mother was under the influence of drugs.

{¶ 34} Continuing, the juvenile court stated:

> The arresting officer testified that he had no doubt that Mother was experiencing the effects of an illegal substance. His sergeant who was also on the scene asked Mother if she was on Xanax. Her story that she took half of one in the early morning of February 29th is simply not believable. Her explanation that [M.G.'s father] must have put those pills in her purse is also disingenuous, especially because the officer testified he had to forcibly remove them from Mother's clenched fist.

{¶ 35} The juvenile court then stated:

> Mother is not able to be reunified with [M.G.] within a reasonable time. Adoption is the best chance for [M.G.] to achieve the stable family home she needs. [M.G.'s] adoption is not possible without a grant of permanent custody of WCCS.

{¶ 36} Furthermore, with respect to any of the factors contained in R.C. 2151.414(E)(7) thru (11), the juvenile court determined that none of these factors applied to the case at bar beyond that which was "enumerated in the Discussion of 'Reasonable Time' Standard section * * *." (Underlined text sic.). In that section, the juvenile court made several findings under R.C. 2151.414(E)(1), (4), and (14) as it relates to whether M.G. could be placed with Mother within a reasonable time or whether M.G. should not be placed with Mother. For example, as it relates to the juvenile court's findings under R.C. 2151.414(E)(1), the juvenile court stated:

> The Court finds that [M.G.] cannot be placed with Mother within a reasonable time period and should not be placed with Mother because, notwithstanding reasonable case planning and diligent efforts by [WCCS], Mother has not remedied her drug problems. This case has taken the maximum amount of time [WCCS] has in which to prosecute dependency cases. Against the "gut feeling" some of the caseworkers had in reunification occurring between Mother and [M.G.], Mother was on the cusp of reuniting with her daughter. Unsupervised visits commenced with overnights. Shortly thereafter, Mother demonstrated to [WCCS] and to the Court on February 29, 2020, that Mother is unable, incapable, and unwilling to live a life free from illegal substances.

- 13 -

{¶ 37} Continuing, the juvenile court stated:

> [Mother's] pain pill addiction was of such a degree that she has been on Suboxone for five years and there is no sign of her weaning off of it. To the contrary, her dependency is increasing with the increase in dosage that occurred a year ago. While the Court has no doubt that Mother suffers from anxiety which leads to panic attacks, the Court in no way believes that Mother was given a sample pack of Xanax from either one, or both, of her visits to the hospital. If she did then Mother could have easily obtained her records and brought them in for everyone to see. As such, the times that Mother tested positive for Xanax, it was done so by the ingestions of an illegal dose of it.

{¶ 38} Additionally, as it relates to the juvenile court's findings under R.C. 2151.414(E)(4), the juvenile court stated:

> The Court finds that Mother has demonstrated a lack of commitment toward [M.G.] by failing to regularly support, visit, or communicate with [M.G.] when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for [M.G.]. For the most part, Mother has visited with [M.G.], but there are instances in which Mother failed to appear for her visits with [M.G.] with one such visit culminating with M.G. commenting "my mother must not want to see me."

{¶ 39} And, as it relates to the juvenile court's findings under R.C. 2151.414(E)(14), the juvenile court stated:

> The Court finds that Mother is unwilling to provide food, clothing, shelter, and other basic necessities for [M.G.] as demonstrated by her lack of compliance with changing behaviors which led to the case being filed in the first place. Mother is undoubtedly thinking that since she has completed most of the case plan services, she should be entitled to reunification with [M.G.]. To that the Court would say, it's more than just meeting case plan objectives. The Court requires behavior modification to occur before reunification can occur. * * * Mother's continued and repeated use of illegal drugs through the life of this case with her final act of being arrested on February 29, 2020 in front of [M.G.] is proof that [Mother] is not able to provide for [M.G.]. * * * Mother was under the influence of Xanax that night and was incapable of taking care of herself, let alone a young child.

**Analysis**

{¶ 40} Mother argues the juvenile court erred by finding it was in M.G.'s best interest to grant WCCS' motion for permanent custody. To support this claim, Mother argues that when weighing all of the best interest factors, like the juvenile court must do in all permanent custody cases, "there are more in her favor than against [her]." Mother also argues that WCCS "did not aid in reunification of the family throughout their case plan and other services."

{¶ 41} However, despite Mother's claims, it is clear that Mother has yet to overcome her significant substance abuse and mental health issues. These are the same two issues that initially led to M.G.'s removal from Mother's care. That is to say nothing of Mother's lack of stable employment, income, and uncertainty regarding her housing. Simply stated, when considering the way this case started is the same way this case ultimately concluded, i.e., Mother being arrested while in the care and custody of M.G., Mother's circumstances remain virtually unchanged since M.G. was initially removed from Mother's care. This remains true even though Mother has engaged in many of the services set forth in her case plan. Therefore, while Mother would like to place the blame for her failings on WCCS, the record indicates those failings are the fault of Mother, and Mother alone.

{¶ 42} "The key concern in a permanent custody proceeding is 'whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody.'" *In re D.B.*, 12th Dist. Warren Nos. CA2019-06-065 thru CA2019-06-067, 2019-Ohio-4514, ¶ 11, quoting *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. The record in this case firmly establishes that Mother did not remedy the concerns that led to M.G.'s removal from her care, let alone substantially remedy those concerns. This remains true despite Mother having over two years to do so. "A parent is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-

002, 2019-Ohio-3134, ¶ 34, citing *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 23.

{¶ 43} In so holding, we note that although the record indicates Mother had completed much of her required case plan services, "successful completion of one's case plan is not dispositive of the issue of reunification." *In re G.C.*, 12th Dist. Butler Nos. CA2016-12-237 thru CA2016-12-240, 2017-Ohio-4226, ¶ 42, citing *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30. This is because, "'the case plan is simply a means to a goal, but not the goal itself.'" *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 68, quoting *In re A.R.*, 12th Dist. Butler No. CA2015-08-143, 2016-Ohio-4919, ¶ 18. It is instead just one factor to consider when determining the best interest of the child. *See In re J.B.*, 12th Dist. Butler No. CA2018-08-175, 2018-Ohio-5049, ¶ 39 (noting that "it is certainly a relevant factor to consider whether Mother completed her case plan services" when determining the best interest of a child in a permanent custody case).

{¶ 44} "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court, just like this court, must act in a manner that places M.G.'s best interest above all else. *In re M.J.T.*, 12th Dist. Butler No. CA2019-03-047, 2019-Ohio-3051, ¶ 46. The juvenile court's decision to grant permanent custody to WCCS does just that. This is particularly true here given the fact that M.G. was bonded with her foster parents and, as the juvenile court found, "doing great" in her foster home. That is to say nothing of the fact that M.G.'s foster parents have indicated their interest in adopting M.G. if WCCS' motion permanent custody was granted. It is the best interest of the child, not a parent's preferred outcome, that is controlling. *In re*

- 16 -

*K.M.*, 12th Dist. Butler No. CA2019-01-015, 2019-Ohio-1833, ¶ 67.

{¶ 45} In light of the foregoing, because the record indicates M.G. is now "doing great" in a stable and secure environment under the care of her foster parents, we agree with the juvenile court's decision to grant WCCS' motion for permanent custody. This is because, under the facts and circumstances of this case, it is clear that granting permanent custody to WCCS is the best chance – and likely only chance – M.G. has to achieve the stable family home she needs. Mother, however, argues the juvenile court's decision was improper since there were "multiple issues on Mother's case." According to Mother, these issues include, but are not limited to, one of Mother's attorneys having a "close personal relationship with the foster family caring for [M.G.]" and a guardian ad litem "who did not see [M.G.] for the entire two years of the case."

{¶ 46} After a thorough review of the record, we fail to see how these "issues" impact the juvenile court's ultimate decision finding it was in in M.G.'s best interest to grant WCCS' motion for permanent custody. But, even if we were, the record is nevertheless clear that the attorney about whom Mother complains was permitted to withdraw after she notified the juvenile court that Mother was "no longer 'ok' with [her] representing [Mother] in this matter" given that she knew M.G.'s foster parents "socially." The fact that one of Mother's attorneys knew M.G.'s foster parents socially, therefore, did not play any role in the juvenile court's decision finding it was in M.G.'s best interest to grant WCCS' motion for permanent custody. This is particularly true here when considering the attorney at issue moved to withdraw immediately after realizing there could be a potential conflict of interest given her relationship with M.G.'s foster parents, something which that attorney did well before the hearing on WCCS' motion for permanent custody began.

{¶ 47} Moreover, as it relates to the "issues" surrounding the guardian ad litem, the record indicates that Mother moved to have the guardian ad litem removed for, among other

things, his lack of interaction with M.G. since his "initial meeting" with M.G. following his appointment as guardian ad litem. The juvenile court, however, denied Mother's motion after taking the matter into consideration and upon reviewing the "activity summary" provided to the juvenile court by the guardian ad litem. Besides making two vague references to the guardian ad litem's limited interaction with M.G. in her brief, Mother did not raise this issue in an assignment of error, nor did Mother in any way allege how the guardian ad litem's lack of interaction with M.G. may have impacted the guardian ad litem's recommendation and/or the juvenile court's decision to grant WCCS' motion. Again, it is the best interest of the child that controls. The juvenile court acted in M.G.'s best interest by granting WCCS' motion for permanent custody. Therefore, finding no merit to any of the arguments raised herein, Mother's sole assignment of error lacks merit and is overruled.

{¶ 48} Judgment affirmed.

HENDRICKSON and BYRNE, JJ., concur.