[Cite as *In re A.V.*, 2024-Ohio-1091.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN RE: :

    A.V., et al. : CASE NO. CA2023-08-067

: O P I N I O N
3/25/2024

:

:

:

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 22-D000019; 22-D000020; 22-D000021; 22-D000022

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Father and Mother, pro se.

Kenyatta Hurd, for Children.

Andrew Brenner, for CASA.

**S. POWELL, P.J.**

{¶ 1} Appellants, the biological parents of A.V., E.V., I.V., and O.V., the four children at issue in this case, appeal the decisions of the Warren County Court of

Common Pleas, Juvenile Division, granting permanent custody of those four children to appellee, Warren County Children Services ("WCCS"). For the reasons outlined below, we affirm the juvenile court's decisions granting permanent custody of the children to WCCS.

**Introduction**

{¶ 2} This is the third appeal involving Mother's and Father's four children, A.V., born on November 20, 2005, twins, E.V. and I.V., born on August 2, 2007, and O.V., born on July 15, 2011. The first appeal was taken from the juvenile court's decisions adjudicating the children as dependent in Case Nos. 20-D000049 through 20-D000052. That appeal resulted in this court reversing the juvenile court's adjudicatory decisions upon finding the state had failed to prove Mother's and Father's drug use had an adverse impact upon the children to warrant state intervention under R.C. 2951.04(C). *In re A.V.*, 12th Dist. Warren Nos. CA2021-04-030 thru CA2021-04-033, 2021-Ohio-3873 (hereinafter, "*In re A.V. I*"). In so holding, this court stated:

> We recognize that a parent's drug use may or can result in environmental risks to his or her children. However, to warrant state intervention under R.C. 2151.04(C), a negative consequence must be shown "to have an adverse impact upon the child[.] That impact cannot be simply inferred in general, but must be specifically demonstrated in clear and convincing manner." [*In re Burrell*, 58 Ohio St.2d 37, 39 (1979)]. Such was not the case here as the record is devoid of any evidence demonstrating that Mother's and Father's drug use had an adverse impact on their children. Without some evidence that the children's environment has been affected in some negative way by Mother's and Father's drug use, there is no clear and convincing evidence of dependency.

*Id.* at ¶ 28. This court did note, however, that our decision could have been different had the state established "some other predicate showing dependency" beyond just

Father's and Mother's drug use.  *Id.* at ¶ 29.

{¶ 3}  The second appeal was taken from the juvenile court's decisions adjudicating the children as dependent in Case Nos. 22-D000019 through 22-D000022. That appeal resulted in this court affirming the juvenile court's decisions adjudicating the children as dependent upon finding returning the children to Father's care—despite there being ongoing concerns about Father's untreated mental health issues, inattentive parenting style, unrecognized domestic violence, and unresolved anger management issues, without Father first addressing those issues—would leave the children unprotected and vulnerable to harmful consequences of a pugnacious parent.  *In re A.V.*, 12th Dist. Warren Nos. CA2022-04-046 thru CA2022-06-049, 2022-Ohio-4719 (hereinafter, "*In re A.V. II*").

{¶ 4}  This appeal, the third appeal, was also taken from Case Nos. 22-D000019 through 22-D000022.  However, unlike the second appeal that involved the juvenile court's decisions adjudicating the children dependent, this appeal involves the juvenile court's dispositional decisions granting permanent custody of the children to WCCS. Therefore, in hopes of avoiding any confusion on the part of Mother and Father, who are both appearing pro se, we note that the present appeal involves *only* the juvenile court's dispositional decisions granting permanent custody of the children to WCCS in Case Nos. 22-D000019 through 22-D000022.  Accordingly, given the well-established doctrine of res judicata, this appeal *does not* concern any issues that either were, or could have been, raised in an appeal from the juvenile court's adjudicatory decisions in Case Nos. 20-D000049 through 20-D000052 and 22-D000019 through 22-D000022 that were the subject of this court's decisions in *In re A.V. I* and *In re A.V. II.*

{¶ 5}  This appeal also does not concern any issues that may have arisen in the

intervening Case Nos. 21-D000083 through 21-D000086 that WCCS voluntarily dismissed without prejudice after it became clear that those cases could not be adjudicated and disposed of within the applicable 90-day statutory timeframe set forth by the now former R.C. 2151.35(B)(1).[1] "[P]ursuant to App.R. 12(A)(1)(a), this court has limited authority and may only affirm, modify, or reverse the judgment or final order appealed." *TD Ltd., LLC v. Dudley*, 12th Dist. Butler No. CA2014-01-009, 2014-Ohio-3996, ¶ 34. For this appeal, that is restricted to the juvenile court's dispositional decisions granting permanent custody of the children to WCCS in Case Nos. 22-D000019 through 22-D000022. To the extent Mother and Father claim otherwise, any such argument is without merit and will not be addressed further within this opinion.

**Facts and Procedural History**

{¶ 6} On March 8, 2022, the children's guardian ad litem filed four complaints alleging each of the four children, A.V., E.V., I.V., and O.V., were dependent. The juvenile court issued its adjudicatory decisions finding the children were dependent on May 27, 2022. Rejecting Father's appeal, this court affirmed the juvenile court's adjudicatory decisions finding the children dependent on December 28, 2022 with our release of the opinion in *In re A.V. II*.

{¶ 7} On March 9, 2023, WCCS moved for permanent custody of the children. To support its permanent custody motions, WCCS noted that Father had neither completed his case plan services nor "meaningfully engaged" with WCCS in the time since the children's four cases were initiated. WCCS also noted that Father's contact with the

---

1. Pursuant to former R.C. 2151.35(B)(1), a juvenile court was required to dismiss an abuse, neglect, and dependency complaint without prejudice where the juvenile court failed to hold a dispositional hearing within the required 90-day time frame set forth within the statute. *See In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 15.

- 4 -

children had been suspended until he could submit to three consecutive drug screens, but that, "[t]o date, Father ha[d] not submitted to any drug screens for WCCS." WCCS further noted that Mother had been "minimally engaged" with her case plan services, that Mother had relapsed "multiple" times throughout the pendency of this case, and that Mother had yet to establish "a sustained period of sobriety throughout this case." Therefore, despite WCCS' reasonable efforts and case plan services offered to Mother and Father, WCCS argued that a grant of permanent custody was in the children's best interest because the children could not be safely returned to Mother's and Father's care within a reasonable time or should not be placed with Mother and Father.

{¶ 8} On August 4, 2023, a final hearing was held on WCCS' motions for permanent custody. Father appeared at this hearing pro se, whereas Mother appeared at this hearing with counsel. During this hearing, the juvenile court heard testimony from a total of four witnesses. This included the testimony of Bridget L. Lemberg, the lab director and toxicologist at Forensic Fluid Laboratories, Inc., a federally certified toxicology laboratory located in Kalamazoo, Michigan, that conducts oral fluid drug testing for WCCS. Lemberg testified regarding Mother's five most recent drug screens processed using a "liquid chromatography tandem mass spectrometry," also referred to as LC-MS/MS, the "most scientifically accurate available instrument that's been scientifically accepted."

{¶ 9} Lemberg testified that Mother's five most recent drug screenings took place on May 12, May 23, June 13, June 14, and June 21, 2023, all five of which tested positive for methamphetamine. Lemberg testified that these positive test results were reported to WCCS only after each sample was tested twice—"[a]nd so that's why one always has to do two tests to get rid of a false positive," something that Lemberg testified can sometimes

occur "on the initial first immunoassay screen or the FDA screen."  When asked what a positive test result for methamphetamine meant, Lomberg testified, "I can tell you that, um, the sample that we received with that name on it at the laboratory, um, ingested methamphetamine."  Following this testimony, Lemberg then testified about whether Mother's claimed use of a Vicks inhaler would result in a "false positive" test result for methamphetamine.  Lemberg testified that it would not.  Specifically, Lemberg testified:

> Um, so false positive is not the correct term.  Um, our tests do not—do not measure prescription of L-methamphetamine (a substance that Lomberg had previously testified Vicks' inhalers "used to contain").  Our—our tests only measure D, which is illicit methamphetamine.  Our tests do not react with L-methamphetamine.  They're specific for illicit or D-methamphetamine.

{¶ 10} The following exchange between WCCS and Lemberg then occurred:

> [WCCS]:  Okay.  So, there is nothing on your test that would indicate then the presence of the Vicks amphetamine; is that correct?
>
> [Lemberg]:  Correct.  We don't—we don't—
>
> [WCCS]:  So even if it's in her system, even if we accept her statement that she's using it, that wouldn't show up on your test because you're not testing for it, correct?
>
> [Lemberg]:  Correct.
>
> [WCCS]:  So, what you are testing for and what you are getting a positive for is something wholly separate from Vicks if she's, in fact using that?
>
> [Lemberg]:  Correct, yes.

{¶ 11} Lemberg later testified that it was the "very bad screens," the "cheaper" tests, like the "instant urine cup, you pee in the cup and you read the lines," that have the potential for giving out a "false positive" because "there's many of them that cross-react with both methamphetamines, the D and the L," which is why "the papers get published

is to tell you that you can have a false positive illicit methamphetamine because you'll be positive of, you know, both—you know, either/or of them in you."  However, as Lemberg testified, the procedure her laboratory uses to test for methamphetamine makes it virtually impossible to have a false positive.  Lemberg testified that this was because:

> We do two different chemical tests, an immunoassay test, which was the screen, that's where false positives do come from.  And then we run the sample in a LC-MS/MS, which chemically or identifies each drug by their fingerprint.  It is the most accurate instrument that's available on—scientifically on the planet, and so that gets rid of false positives.

{¶ 12}  On August 7, 2023, the juvenile court issued four separate, albeit identically worded decisions granting permanent custody of the children to WCCS.  In each of those four decisions, the juvenile court found clear and convincing evidence that Father had abandoned the children by not having any contact with the children for over two years.  The juvenile court also determined that the children had been in WCCS' temporary custody for at least 12 months of a consecutive 22-month period prior to WCCS filing its motions for permanent custody, and that, notwithstanding reasonable case planning and diligent efforts by WCCS, the children could not be placed with either Mother or Father within a reasonable period of time or that the children should not be placed with Mother or Father.

{¶ 13}  In reaching this decision, the juvenile court stated regarding Mother:

> Mother has failed continuously and repeatedly to substantially remedy the condition causing the Children to be placed outside the Children's home.  Specifically, Mother failed to utilize rehabilitative services and material resources that were made available for the purpose of changing parental conduct to allow her to resume and maintain parental duties.  Mother has not shown her ability to maintain her sobriety.  Her claim that her positive drug screens are due to her usage of an inhaler (whether it be Vicks or a generic brand from Wal-Mart) is disingenuous and simply not believable.  The Court further

finds the falsehood she conveyed to [E.V.] in February 2023 during a joint counseling session, which led [E.V.] to believe that Mother was doing what she needed to reunify with the children, to be unconscionable.

{¶ 14} In regard to Father, the juvenile court stated:

The Court believes Father when he says he loves his Children; however, all he had to do is maintain sobriety and cooperate with the Agency as they ensure both parents are no longer using illicit substances so that he could reunify with the Children. Instead, Father chose to turn his back on the Agency and refuse to cooperate with the Agency. In doing so, he has missed out on the opportunity to visit with the Children for the past two years. And, more importantly, he has not completed any case plan services which would allow him the opportunity to demonstrate his sobriety so that reunification with the Children could occur.

{¶ 15} The juvenile court also determined that granting permanent custody of the children to WCCS was in the children's best interest. In so doing, the juvenile court again noted its finding that Father had abandoned the children by not having any contact with the children for over two years. The juvenile court also noted that Mother was "not able to be reunified with the Children within a reasonable time due to her continued use of illicit drugs." The juvenile court found that to be the case even though Mother had "made progress" by completing "most" of her case plan services. The juvenile court reached this decision upon finding Mother had "not demonstrated that she is able to retain [her] sobriety and provide the continued care and attention the Children need," thereby demonstrating that "the problems that led to the Children's removal (illegal drug usage), [had] not been substantially remedied."

{¶ 16} The juvenile court further noted that the children's basic needs were being met in their current foster home, that the children had "bonded with the foster family and the foster family has bonded with them," and that the children were "thriving there and

- 8 -

appear to be happy."  The juvenile court thereafter concluded by finding adoption was "the best chance" for the children to "achieve the stable family home they need," something which was not possible without a grant of permanent custody to WCCS.

**Mother's and Father's Appeal and Five Assignments of Error**

{¶ 17}  On August 17, 2023, Father filed a notice of appeal from the juvenile court's decisions granting WCCS' motions for permanent custody of the children.  Mother filed her own notice of appeal from the juvenile court's permanent custody decisions on August 22, 2023.  Mother's and Father's separate appeals were thereafter consolidated by this court on September 20, 2023.  Mother's and Father's appeals now properly before this court for decision, Mother and Father have jointly filed an appellate brief raising five assignments of error for review.

*Assignment of Error No. 1:*

{¶ 18} THE JUVENILE COURT ERRED BECAUSE THE COURT LACKED SUBJECT MATTER JURISDICTION TO ADJUDICATE THIS CASE(S).

{¶ 19}  In their first assignment of error, Mother and Father argue the juvenile court lacked subject-matter jurisdiction to grant permanent custody of the children, A.V., E.V., I.V., and O.V., to WCCS.  To support this argument, Mother and Father make a series of bizarre assertions regarding the impact of this court's decision issued in *In re A.V. I*, a decision in which this court reversed the juvenile court's original adjudicatory decisions in Case Nos. 20-D000049 through 20-D000052.  This includes Mother and Father arguing that, upon this court issuing our decision in *In re A.V. I*, the juvenile court was immediately divested of subject-matter jurisdiction over the children, thereby stripping the juvenile court of any judicial authority to appoint a guardian ad litem for the children. According to Mother and Father, this was because "there was no longer any proceeding, case, nor a

- 9 -

nexus for the Trial Court to appoint a GAL," thereby "rendering proclamation or action arising from by the Juvenile Trial Court VOID AB INITIO," as well as "all complaints" filed by the children's "newly (incorrectly) appointed GAL." Mother and Father argue that this would necessarily include the complaints that the children's guardian ad litem filed with the juvenile court on March 8, 2022. However, as will be a running theme in this case, Mother's and Father's argument that the juvenile court somehow lost subject-matter jurisdiction based upon our decision in *In re A.V. I* is illogical and wholly lacking support in both the law and the facts.

{¶ 20} "'Subject-matter jurisdiction of a court connotes the power to hear and decide a case upon its merits.'" *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705,¶ 15, quoting *Morrison v. Steiner*, 32 Ohio St.2d 86, 87 (1972). That is to say, "[s]ubject-matter jurisdiction refers to the constitutional or statutory power of a court to adjudicate a particular class or type of case." *Corder v. Ohio Edison Co.*, 162 Ohio St.3d 639, 2020-Ohio-5220, ¶ 14, citing *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, ¶ 11-12, 34. The Ohio Constitution, Article IV, Section 4(B), provides that "[t]he courts of common pleas and divisions thereof shall have such original jurisdiction over all justiciable matters" as may be "provided by law." "Therefore, the general subject-matter jurisdiction of Ohio courts of common pleas is defined by the legislature." *In re K.K.*, 170 Ohio St.3d 149, 2022-Ohio-3888, ¶ 52. This would include Ohio's juvenile courts for it is well established that the juvenile courts in Ohio "are statutory courts, created by the General Assembly." *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, ¶ 14.

{¶ 21} R.C. 2151.07 establishes Ohio's juvenile courts, which are divisions of Ohio's courts of common pleas. *State v. Hudson*, 169 Ohio St.3d 216, 2022-Ohio-1435,

¶ 24. Because of this, juvenile courts in Ohio "are courts of limited jurisdiction whose powers are created solely by statute." *In re S.M.*, 12th Dist. Madison No. CA2009-02-008, 2009-Ohio-4677, ¶ 14, citing *Carnes v. Kemp*, 104 Ohio St.3d 629, 2004-Ohio-7107,

¶ 25. This means Ohio's juvenile courts have jurisdiction only over "certain subject matters as courts of record within courts of common pleas." *Caballero v. Caballero*, 10th Dist. Franklin No. 22AP-450, 2023-Ohio-1006, ¶ 14. For example, pursuant to R.C. 2151.23(A)(1), Ohio's juvenile courts are vested with "exclusive original jurisdiction" over "any child who on or about the date specified in the complaint" is alleged to be an "abused, neglected, or dependent child." This would include the juvenile court having exclusive original jurisdiction over any subsequent permanent custody disposition regarding said child. *See In re Kincaid*, 4th Dist. Lawrence No 00CA3, 2000 Ohio App. LEXIS 5132, *10 (Oct. 27, 2000) ("juvenile courts have exclusive jurisdiction in permanent custody proceedings under R.C. 2151.23[A][1]").

{¶ 22} Therefore, because the cases in which this appeal arose, Case Nos. 22-D000019 through 22-D000022, originated with the children's guardian ad litem filing four complaints with the juvenile court on March 8, 2022 alleging each of the four children were dependent, an issue that is vested within the juvenile court's exclusive original jurisdiction in accordance with R.C. 2151.23(A)(1), the juvenile court had subject-matter jurisdiction over the children and acted well within its judicial authority by granting permanent custody of the children to WCCS. *See, e.g., In re J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, ¶ 11 ("[t]his action, therefore, involving the permanent custody of [a child] following a complaint alleging neglect, is within the subject-matter jurisdiction of the juvenile court as specified in R.C. 2151.23[A][1]"); *In re L.H.*, 10th Dist. No. 06AP-23, 2006-Ohio-4116, ¶ 8 (holding that, in an appeal from a juvenile court's permanent custody

decision, the juvenile court "acquired subject-matter jurisdiction over this matter with the filing of a dependency complaint"). This holds true regardless of this court's earlier decision issued in *In re A.V. I* reversing the juvenile court's original decisions adjudicating the children as dependent in Case Nos. 20-D000049 through 20-D000052. Those four cases are unconnected and independent from the four cases at issue in this appeal. Accordingly, finding no merit to any of the arguments raised by Mother and Father herein, Mother's and Father's first assignment of error lacks merit and is overruled.

*Assignment of Error No. 2:*

{¶ 23} THE JUVENILE COURT ERRED WHEN IT IGNORED APPELLANT FATHER'S JURISDICTIONAL CHALLENGE AND PERMITTED THE CLAIMANT TO PROCEED WITHOUT VERIFYING JURISDICTION.

{¶ 24} In their second assignment of error, Mother and Father argue the juvenile court erred by overruling Father's two "jurisdictional challenges" he filed with the court on April 4 and 14, 2023, respectively.[2] To support this claim, Mother and Father argue that once Father submitted his challenges to the juvenile court's jurisdiction, it was incumbent upon WCCS "to establish the court's jurisdiction *before* [the] court [could] proceed judicially." However, even if we were to assume Mother's and Father's understanding of the law were correct, which it is not, given our resolution above regarding Mother's and Father's first assignment of error, Mother's and Father's second assignment of error has now been rendered moot. Pursuant to App.R. 12(A)(1)(c), "[u]nless an assignment of error is made moot by a ruling on another assignment of error," this court shall "decide

---

2. The arguments Father raised within his two "jurisdictional challenges" were reminiscent of the "sovereign citizen" arguments that Father had previously raised to this court in *In re A.V. II* for which we noted had been "roundly rejected as lacking any merit and patently frivolous." *Id.*, 2022-Ohio-4719 at ¶ 18, fn. 6.

- 12 -

each assignment of error and give reasons in writing for its decision." "An assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court." *Sweitzer v. 56 Auto Sales*, 12th Dist. Madison No. CA2022-12-026, 2023-Ohio-2997, ¶ 9. Therefore, in accordance with App.R. 12(A)(1)(c), Mother's and Father's second assignment of error is moot and need not be further addressed.

*Assignment of Error No. 3:*

{¶ 25} THE JUVENILE COURT ERRED WHEN IT FAILED TO OFFER APPELLANTS AN OPPORTUNITY TO BE HEARD FOLLOWING AN EX-PARTE MEETING WITH COMPLAINANT ON MARCH 8TH, 2022, WHERE THE PREVIOUS CASE(S) WERE DISMISSED PURSUANT TO CIV.R. 41(A)(2), GIVING A CLEAR ADVANTAGE TO CLAIMANT, DEPRIVING APPELLANTS OF DUE PROCESS AND THE RIGHT TO A FAIR IMPARTIAL TRIAL.

{¶ 26} In their third assignment of error, Mother and Father make a variety of arguments challenging the juvenile court's decision to grant WCCS' motions voluntarily dismissing the intervening Case Nos. 21-D000083 through 21-D000086 without prejudice once it became clear that those cases could not be adjudicated and disposed of within the applicable 90-day statutory timeframe set forth by former R.C. 2151.35(B)(1). However, as noted above, this appeal concerns only the juvenile court's dispositional decisions granting permanent custody of the children to WCCS in Case Nos. 22-D000019 through 22-D000022 and not any issues that could have been appealed, but were not, in the intervening Case Nos. 21-D000083 through 21-D000086. Again, "pursuant to App.R. 12(A)(1)(a), this court has limited authority and may only affirm, modify, or reverse the judgment or final order appealed." *TD Ltd.,* 2014-Ohio-3996 at ¶ 34. Therefore, while it

is clear that Mother and Father would prefer it to be different, because this appeal concerns only the juvenile court's dispositional decisions granting permanent custody of the children to WCCS in Case Nos. 22-D000019 through 22-D000022, and not anything that occurred in the intervening Case Nos. 21-D000083 through 21-D000086 that WCCS voluntarily dismissed without prejudice, Mother's and Father's third assignment of error lacks merit and is overruled.

*Assignment of Error No. 4:*

{¶ 27} THE JUVENILE COURT ERRED WHEN IT EXHIBITED A JUDICIAL BIAS DEPRIVING APPELLANTS OF THEIR NATURAL AND CONSTITUTIONALLY PROTECTED RIGHTS AND LIBERTIES. CAUSING THE TRIAL COURT TO LOSE SUBJECT MATTER JURISDICTION.

{¶ 28} In their fourth assignment of error, Mother and Father argue the juvenile court was biased against them, thereby depriving the juvenile court of its subject-matter jurisdiction to grant permanent custody of the children to WCCS. However, even if we were to assume that the juvenile court's alleged bias against Mother and Father had anything to do with the juvenile court's subject-matter jurisdiction to grant permanent custody of the children to WCCS, which it does not, it is well established that this court "has no authority to render a decision with regard to disqualification or to void a trial court's judgment on the basis of personal bias or prejudice on the part of the trial judge." *Reed v. Triton Servs.*, 12th Dist. Clermont No. CA2018-07-049, 2019-Ohio-1587, ¶ 21. It is instead "[t]he Chief Justice of the Ohio Supreme Court, or appropriate designee, [who] has exclusive jurisdiction to determine a claim that a common pleas court judge is biased or prejudiced." *Mootispaw v. Wenninger*, 12th Dist. Brown No. CA2015-08-024, 2016-Ohio-1287, ¶ 10. Therefore, as this court lacks the judicial authority to consider Mother's

- 14 -

and Father's argument that the juvenile court was biased against them, *see Vogel v. Felts*, 12th Dist. Clermont No. CA2008-05-051, 2008-Ohio-6569, ¶ 14 ("regarding appellant's allegations of judicial bias and misconduct, this court has no jurisdiction to address appellant's claim"), Mother's and Father's fourth assignment of error lacks merit is overruled.

*Assignment of Error No. 5:*

{¶ 29} THE JUVENILE COURT ERRED IN ITS DECISION WHEN IT STATES THAT THE FACTS PRESENTED CONSTITUTE CLEAR AND CONVINCING EVIDENCE TO TERMINATE PARENTAL RIGHTS.

{¶ 30} In their fifth assignment of error, Mother and Father argue the juvenile court erred by granting permanent custody of their four children to WCCS. Although not explicit, to support this claim, Mother and Father argue the juvenile court's decision finding it was in the children's best interest to grant WCCS' motions for permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree with both of Mother's and Father's claims.

<u>Sufficiency and Manifest Weight of the Evidence Standards</u>

{¶ 31} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 12th Dist. Butler No. CA2020-07-074, 2020-Ohio-6663, ¶ 13. "That is to say, the juvenile court's decision to grant permanent custody must be supported by sufficient evidence." *In re P.E.*, 12th Dist. Clermont No. CA2023-04-021, 2023-Ohio-2438, ¶ 14. Sufficiency of the evidence is a test of adequacy, i.e., the burden of production. *In re J.E.*, 12th Dist. Fayette No. CA2023-08-013, 2023-Ohio-3827, ¶ 10, citing *In re L.C.*, 5th Dist. Stark No. 2023CA0043, 2023-

Ohio-2989, ¶ 16. "[W]hether the evidence is sufficient to sustain the judgment is a question of law." *In re Z.J.*, 1st Dist. Hamilton No. C-220627, 2023-Ohio-1347, ¶ 27. "Questions of law, even in permanent custody cases, are reviewed by this court de novo." *In re N.G.*, 12th Dist. Clinton Nos. CA2023-06-013 and CA2023-06-014, ¶ 15. In conducting a de novo review, this court independently reviews the record without giving deference to the juvenile court's decision. *In re S.C.R.*, 12th Dist. Clinton No. CA2017-11-018, 2018-Ohio-4063, ¶ 13. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 32} "'Manifest weight tests the burden of persuasion, not the burden of production.'" *In re N.G.* at ¶ 16, quoting *Magnum Steel & Trading, LLC v. Mink*, 9th Dist. Summit Nos. 26127 and 26231, 2013-Ohio-2431, ¶ 31. In determining whether a juvenile court's permanent custody decision is against the manifest weight of the evidence, this court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-

- 16 -

Ohio-5367, ¶ 15. "We are especially mindful of this in permanent custody cases." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 26. This is because, as it is now well established, "the demeanor and attitude of the witnesses may not translate into the record." *C.A. v. H.S.*, 12th Dist. Fayette No. CA2019-09-021, 2020-Ohio-4352, ¶ 16, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

R.C. 2151.414(B)(1) and the Applicable Two-Part Permanent Custody Test

{¶ 33} The state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met before a natural parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 14, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). In Ohio, it is R.C. 2151.414(B)(1) that sets forth the statutory standard for permanent custody applicable to the case at bar. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-050 thru CA2021-08-052, 2022-Ohio-49, ¶ 30. R.C. 2151.414(B)(1) provides a two-part permanent custody test. *See In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. One part of that two-part permanent custody test requires the juvenile court to find the grant of permanent custody to be in the children's best interest.[3] *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. This is generally done by

---

3. The other part of that two-part test requires the juvenile court to find that any one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) applies. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. "This includes a circumstance, often referred to as the '12 of 22' provision, where the subject child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period." *In re A.D.*, 12th Dist. Clermont No. CA2021-11-060, 2022-Ohio-736, ¶ 20, citing R.C. 2151.414(B)(1)(d). Neither Mother nor Father dispute that the children were in the temporary custody of WCCS for at least 12 months of a consecutive 22-month period prior to WCCS filing its motions for permanent custody. Therefore, for purposes of this opinion, we will focus our attention on what is actually in dispute; that being, whether the juvenile court's decision to grant permanent custody of the children to WCCS was in the children's best interest.

utilizing the best-interest factors set forth in R.C. 2151.414(D)(1). *In re S.W.*, 12th Dist. Preble Nos. CA2022-08-013 and CA2022-08-014, 2023-Ohio-118, ¶ 19. These factors include, but are not limited to: (1) the interaction and interrelationship of the children with the children's parents; (2) the wishes of the children, as expressed directly by the children or through the children's guardian ad litem; (3) the custodial history of the children; and (4) the children's need for a legally secure permanent placement. R.C. 2151.414(D)(1)(a)-(d). These factors also include whether any of the circumstances listed in R.C. 2151.414(E)(7) to (11) apply. *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 41, citing R.C. 2151.414(D)(1)(e).

### Mother's and Father's First Argument and Analysis

{¶ 34} Initially, Mother and Father argue the juvenile court erred by finding it was in the children's best interest to grant permanent custody to WCCS because the juvenile court failed to ensure that WCCS had made "reasonable efforts" to prevent the children's removal from their care. Mother and Father argue the juvenile court did this by not mandating WCCS verify the various drug screens in which Mother tested positive for methamphetamine "with an Isomer Test as mother requested a couple of dozen times." This alleged failure, according to Mother and Father, resulted in the juvenile court relying on "questionable, faulty, inaccurate, non-verified drug screens" when finding it was in the children's best interest to grant permanent custody of the children to WCCS.

{¶ 35} However, as set forth above, the juvenile court found Mother's "claim that her positive drug screens are due to her usage of an inhaler (whether it be Vicks or a generic brand from Wal-Mart) is disingenuous and simply not believable." The juvenile court reached this decision based upon Lemberg's testimony that it was virtually impossible for her laboratory to return a false positive due to Mother having used a Vicks

inhaler because:

> Um, our tests do not—do not measure prescription of L-methamphetamine (the substance Lemberg testified Vicks' inhalers "used to contain"). Our—our tests only measure D, which is illicit methamphetamine. Our tests do not react with L-methamphetamine. They're specific for illicit or D-methamphetamine.

The juvenile court, as the trier of fact, clearly found Lemberg's testimony about the accuracy of her laboratory's test results credible. This was not error. It is the juvenile court, not this court, that is in the best position to determine the credibility of witnesses and determine the weight to be given to the evidence. *In re S.A.*, 12th Dist. Butler Nos. CA2017-07-092 thru CA2017-07-098, 2017-Ohio-8792, ¶ 45. Therefore, Mother's and Father's first argument lacks merit.

Mother's and Father's Second Argument and Analysis

{¶ 36} Mother and Father also argue the juvenile court erred by finding it was in the children's best interest to grant permanent custody to WCCS because the juvenile court failed to consider the evidence presented by Father and instead "relied on questionable, faulty, inaccurate, non-verified drug screens as evidence from the WCCS in its case." However, simply because the juvenile court, as the trier of fact, either did not find Father's evidence credible, or determined that such evidence was not entitled to any greater weight than it received, does not mean the juvenile failed to take Father's evidence into consideration when reaching its decision finding it was in the children's best interest to grant permanent custody to WCCS. *In re T.G.O.*, 12th Dist. Madison No. CA2016-02-009, 2017-Ohio-151, ¶ 15. Again, it is the juvenile court, not this court, that is in the best position to determine the credibility of the witnesses and determine the weight to be given to the evidence. *In re S.A.*, 2017-Ohio-8792 at ¶ 45. Therefore,

Mother's and Father's second argument also lacks merit.

<u>Mother's and Father's Third Argument and Analysis</u>

{¶ 37} Mother and Father further argue the juvenile court erred by finding it was in the children's best interest to grant permanent custody to WCCS when considering Mother's "commitment to sobriety," her "absolute denial of using or abusing the illicit drug methamphetamine," her ongoing "professional achievements" obtained through her employer, her ability to maintain "adequate" housing throughout the pendency of this case, and her prior "negative hair follicle drug screen" that she had submitted several years earlier on November 27, 2020. However, even when taking each of these factors into consideration, the juvenile court nevertheless determined that Mother was "not able to be reunified with the Children within a reasonable time due to her continued use of illicit drugs." The juvenile court found that to be the case even though Mother had "made progress" by completing "most" of her case plan services.

{¶ 38} The juvenile court reached this decision upon finding Mother had "not demonstrated that she [was] able to retain [her] sobriety and provide the continued care and attention the Children need," thereby demonstrating that "the problems that led to the Children's removal (illegal drug usage), [had] not been substantially remedied." The juvenile court further noted that the children's basic needs were being met in their current foster home, that the children had "bonded with the foster family and the foster family has bonded with them," and that the children were "thriving there and appear to be happy." This is in addition to the juvenile court finding adoption was "the best chance" for the children to "achieve the stable family home they need," something which was not possible without a grant of permanent custody to WCCS. The juvenile court's findings are supported by the record. Therefore, Mother's and Father's third argument lacks merit.

- 20 -

### Mother's and Father's Fourth Argument and Analysis

{¶ 39} Lastly, Mother and Father argue the juvenile court erred by finding it was in the children's best interest to grant permanent custody to WCCS because the record failed to establish them as an unsuitable option to parent their four children. However, albeit implicitly rather than expressly determined, the juvenile court had already found Mother and Father unsuitable given the court's prior adjudication of the children as dependent, an adjudicatory decision this court later affirmed on appeal. *In re M.D.*, 12th Dist. Butler No. CA2006-09-223, 2007-Ohio-4646, ¶ 20 ("where a child has previously been adjudicated abused, neglected or dependent * * * such an adjudication implicitly involves a determination of parental unsuitability").

{¶ 40} Moreover, inherent within the children being placed in WCCS' temporary custody for at least 12 months of a consecutive 22-month period at the time WCCS moved for permanent custody, a fact that neither Mother nor Father dispute, rests the finding that Mother and Father were unable, unfit, or unsuitable to properly care for the children. *In re S.K.*, 12th Dist. Fayette Nos. CA2018-11-025 and CA2018-11-026, 2019-Ohio-2278, ¶ 49 ("[i]nherent within a 12-of-22 month finding rests the finding that [a mother] was unable, unfit, or unsuitable to care for her children"). Therefore, because the juvenile court was not required to find Mother and Father unsuitable prior to granting permanent custody of the children to WCCS, Mother's and Father's fourth argument is likewise without merit.

### Summary of Mother's and Father's Arguments

{¶ 41} "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The record in this

case indicates that returning the children to Mother's and Father's care, even if just for a brief, temporary reunification, could have significant impact on their development and potential to grow and mature into well-rounded adults. These children's lives are not an experiment that can be left to chance. *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 39. This is particularly true in this case given the fact that the children are now thriving under the care of their foster family as opposed to the chaos that marked their lives while living with Mother and Father. The main concern—one that overrides all else—is the best interest of the children. *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 54. The juvenile court's decision finding the children's best interests were served by granting WCCS permanent custody was therefore proper. Accordingly, finding no merit to any of the arguments raised by Mother and Father herein, Mother's and Father's fifth assignment of error lacks merit and is overruled.

**Conclusion**

{¶ 42} For the reasons outlined above, and having now either overruled or mooted Mother's and Father's five assignments of error, Mother's and Father's appeal from the juvenile court's decision granting permanent custody of their four children, A.V., E.V., I.V., and O.V., to WCCS is denied.

{¶ 43} Judgment affirmed.


HENDRICKSON and PIPER, JJ., concur.